ILLINOIS TERMINAL RAILROAD
COMPANY
v.
The UNITED STATES.
No. 16–64.

United States Court of Claims.
April 14, 1967.

Robert T. Molloy, Washington, D. C., attorney of record, for plaintiff. Gerald J. O'Rourke, Jr., and Robert E. Simpson, Washington, D. C., of counsel.

Edna G. Parker, Washington, D. C., with whom was Asst. Atty. Gen., Mitchell Rogovin, for defendant. Philip R. Miller, Washington, D. C., of counsel.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON and NICHOLS, Judges.

## OPINION

PER CURIAM.

This case was referred to Chief Trial Commissioner Marion T. Bennett with directions to make findings of fact and recommendation for conclusion of law. The commissioner has done so in a report and opinion filed on April 25, 1966. Exceptions to the commissioner's findings, opinion and recommendation for conclusions of law were filed by plaintiff. The case was submitted to the court on the briefs of the parties and oral argument of counsel. Since the court is in agreement with the opinion, findings and recommendation of the commissioner, with modifications, it hereby adopts the same, as modified, as the basis for its judgment in this case, as hereinafter set forth. Plaintiff is, therefore, not entitled to recover and the petition is dismissed.

Commissioner Bennett's opinion,* as modified by the court is as follows:

At issue in this tax refund case is whether plaintiff corporation shall be denied the benefits of section 163(a) of the Internal Revenue Code of 1954, 26 U.S.C. § 163(a) (1964), which permits a deduction for "all interest paid or accrued within the taxable year on indebtedness" because of the limitation imposed by section 265(2) of the Internal Revenue Code of 1954:

No deduction shall be allowed for—

(1) * * *

(2) *Interest.*

Interest on indebtedness incurred or continued to purchase or carry obligations (other than obligations of the United States issued after September 24, 1917, and originally subscribed for by the taxpayer) the interest on which is wholly exempt from the taxes imposed by this subtitle. * * *

Plaintiff was organized under the laws of Delaware and has its principal offices in St. Louis, Missouri. Plaintiff is a common carrier by railroad operating in interstate commerce and subject to the jurisdiction of the Interstate Commerce Commission, hereinafter referred to as the I.C.C. At all times pertinent, it filed its federal income tax returns on the accrual method of accounting and on the basis of the calendar year ending December 31. Plaintiff was incorporated in 1954 by a group of 11 trunkline railroads which had offered to purchase the assets and assume the liabilities of an Illinois corporation (plaintiff's predecessor) for $20,015,635 in cash. On April 2, 1956, the I.C.C. approved the sale, authorized plaintiff to issue 2,000 shares of capital stock to the trunkline railroads and permitted them to endorse plaintiff's note for a sum not to exceed $20,015,635. The sale was consummated on June 15, 1956. Among the assets so acquired was

---

* The opinion, findings of fact and recommended conclusion of law are submitted under the order of reference and Rule 57(a).

approximately $3,000,000 in cash, some $2,500,000 of which plaintiff used to invest in government securities and commercial notes. Among the physical assets that plaintiff acquired were locomotives, freight and passenger cars, depots, tracks and rights-of-way in Missouri and Illinois. In addition, plaintiff acquired the McKinley Bridge, which spanned the Mississippi River at St. Louis, Missouri, and connected St. Louis with Venice, Illinois.

The McKinley Bridge carried railroad tracks and a highway. It was the largest single asset that plaintiff acquired, and at the time of the I.C.C. approval, plaintiff had intended to sell the bridge to the Bi-State Development Agency for $13,500,000 and to obtain an exclusive leaseback of the railroad track and other rail facilities for 40 years or other term to be agreed on by the parties. The sale was to occur contemporaneously with the purchase of assets from plaintiff's predecessor and was intended to finance $13,500,000 of the $20,015,635 purchase price, with the remaining $6,515,635 to be borrowed from the Mercantile Trust Company. But Bi-State, created under a compact between Illinois and Missouri, became embroiled in litigation in the state courts, and the sale was never completed.

The full $20,015,635 purchase price of the assets had to be financed by a loan for that amount from the Mercantile Trust Company. The loan was obtained on June 15, 1956, for plaintiff's unsecured, 2-year, 4-percent promissory note, plus the endorsement of the group of railroad company shareholders. The debt was originally intended to provide interim financing until the bridge could be sold. But the bridge was not sold until November 21, 1958, and the note was extended from June 15, 1958, to December 15, 1958.

Finally, on November 21, 1958, the bridge, which had been allocated a cost basis of $8,531,370.93 by the Internal Revenue Service, was sold to the city of Venice, Illinois. The city paid plaintiff $9,000,000 in cash and $11,000,000 par value of the city of Venice's Subordinate Bridge Revenue Bonds, Series "B," dated October 1, 1958, and due October 1, 1998, bearing interest at 2 percent from October 1, 1960. The interest on these Series "B" bonds was and still remains excludible from gross income for purposes of the federal income tax. The $9,000,000 in cash was applied by plaintiff to its outstanding debt, causing the debt to be reduced to $11,015,635.

The ordinance which authorized the issuance of the Series "B" bonds by the city of Venice provided for their redemption prior to maturity upon certain conditions without the approval of the bondholders. It also permitted the modification of the ordinance with the approval of the City Council and holder or holders of 75 percent—

* * * in principal amount of each series of the Bonds then outstanding, * * * provided, however, that no such modification or alteration shall extend the maturity of or reduce the interest rate on, or otherwise alter or impair the obligation to pay the principal or interest or redemption premiums, if any, at the time and place and at the rate and in the currency provided therein of any Bond, without the express consent of the holder or registered owner of such Bond, or reduce the percentage of Bonds required for the affirmative vote or written consent to a modification or alteration, or alter or impair the covenants set forth in Section 5.01 hereof. * * * [Article X, § 10.02.]

Plaintiff's present bondholdings represent 70.9 percent of the Series "B" bonds issued.

Rail facilities on the bridge were leased back to the plaintiff at the time of the sale under terms which created a 50-year leasehold and options in perpetuity to renew the lease for successive terms of 50 years. The McKinley Bridge is very important in plaintiff's operations, and a substantial part of its revenues are earned by reason of having access to that bridge for transriver shipments.

Due to delays in arranging for permanent financing, the maturity date of plaintiff's debt was extended from December 15, 1958, to December 15, 1959, with interest at 4¼ percent. On December 31, 1958, plaintiff sold some of its capital assets and United States Treasury bills for cash and used $515,635 of the proceeds to reduce the balance on its promissory note to $10,500,000. Then, in January of 1959, plaintiff requested offers from two investment firms to purchase $4,000,000 par value of the Series "B" bonds. Both firms had shown an earlier interset in the bonds and both submitted bids. The higher bid of 30.-799 percent of par "flat" was submitted by B. J. Van Ingen & Company, Inc., which had previously shown an interest in purchasing all or part of the $11,000,-000 par value Series "B" bonds and which reiterated its interest in purchasing any future offerings of the bonds. Plaintiff refused to make any commitments about the prospects for additional sales, but because Van Ingen was the highest bidder for the current offerings, plaintiff sold and Van Ingen purchased $3,200,000 par value of the Series "B" bonds for $985,568. This sale served the additional function of establishing an overall value of $3,387,890 for the $11,-000,000 face amount of the Series "B" bonds, which value plaintiff and the Internal Revenue Service used in computing the tax arising from the sale of the bridge in 1958.

The sale to Van Ingen was consummated on March 10, 1959. Plaintiff used $500,000 of the proceeds to reduce the balance on its promissory note to $10,-000,000. The note was further reduced to $9,000,000 on April 14, 1959, when plaintiff sold certain notes and applied the proceeds against the debt.

During 1959, plaintiff received two communications expressing an interest in purchasing a portion of plaintiff's Series "B" bondholdings. One inquiry was from the First Boston Corporation while the other was from McCormick & Company, which made a firm offer. No action was taken on either the inquiry or the offer.

After extending the note to December 15, 1960, with interest at 5½ percent, plaintiff reduced it by $500,000 on October 14, 1960, leaving a balance of $8,500,-000. Plaintiff was still unable to arrange permanent financing, however, and had to extend the maturity date on the promissory note continually, first to December 15, 1961, with interest at 5 percent, then to December 15, 1962, and finally to December 15, 1963.

Early in 1962, plaintiff received an offer from Van Ingen to purchase $1,-800,000 par value of the Series "B" bonds for 50 percent of par, plus accrued interest. This offer was considerably more than either the First Boston Corporation suggested or McCormick & Company had offered. Moreover, Van Ingen offered to purchase all or part of the remaining $6,000,000 par value for similar cash terms or substituted securities. The offer was declined. Plaintiff continues to receive inquiries about, and offers to purchase, the Series "B" bonds. No action has been taken with respect to any of these inquiries or offers.

In December 1962, plaintiff pledged the remaining $7,800,000 par value of the Series "B" bonds as security with the Mercantile Trust Company for issuance of plaintiff's First Mortgage, Series "A" Bonds. The Series "B" bonds were pledged, and the operation of the sinking fund on behalf of the Series "A" bonds was accelerated, in order to get an "A"-quality rating from Standard & Poor's on the First Mortgage, Series "A" Bonds. The A-quality rating caused the plaintiff's interest cost for the Series "A" bonds to be less than would have been the case if the original "BBB"-quality rating had obtained. The A-quality rating probably also increased the marketability of the Series "A" bonds. Proceeds from the sale of the Series "A" bonds were used to pay off the balance of plaintiff's promissory note.

During the calendar year 1959, interest totaling $403,597 accrued against plaintiff and was deducted in plaintiff's

1959 federal income tax return. Upon audit, the Commissioner of Internal Revenue disallowed $111,494.49 of the interest so accrued and deducted on the ground that this portion of the interest related to the tax-exempt Series "B" bonds and was nondeductible under section 265(2) of the Internal Revenue Code of 1954. Plaintiff had claimed a net operating loss for 1959 which was reduced by, among other things, the $111,-494.49 disallowance. Consequently, the amount of the net operating loss which would carry back to 1956 was similarly reduced, and the Internal Revenue Service recomputed plaintiff's 1956 federal income tax liability.

In March 1963, plaintiff paid into the Treasury of the United States an assessed deficiency in income taxes for 1956 of $94,726.90, together with $17,-998.11 in deficiency interest. This deficiency resulted from the disallowance of the interest deduction discussed above, and other adjustments not in issue in this case. Plaintiff made a timely claim for refund and now sues for refund of federal income taxes for the year 1956 on the ground that the Commissioner's disallowance of the interest deduction of $111,494.49 for the year 1959 and the resulting reduction of the net operating loss carryback to the year 1956 were improper and unlawful. The claim here is for $57,977.13, plus deficiency interest paid thereon, and statutory interest as provided by law.

It is evident from the facts that the original $20,015,635 loan was not "incurred" to purchase the city of Venice bonds. What is less evident, however, is the underlying reason for the continuing existence in 1959 of a debt ranging in magnitude from $10,500,000 to $9,000,-000 during a portion of the period that plaintiff owned the tax-exempt city of Venice bonds, for defendant claimed that the indebtedness was "continued" in order to "carry" the bonds, while plaintiff argued that the bonds were unrelated to the loan and instrumental to the successful long-term financing of its business. Because the proceeds from the sale of the bridge were used in part to reduce the loan by more than the cost basis of the bridge, plaintiff argues, the remaining debt must be identified with the other assets and expenses which were acquired or incurred during the purchase and early operation of the business and the additional consideration in the form of municipal bonds represents appreciation in the value of the bridge, and, hence, is unrelated to the debt.

But, plaintiff is in error, for by assuming that funds from the loan in question must be traceable to the *cost* of the bonds, it fails to distinguish between "incurred * * * to purchase" and "continued * * * to carry." That assumption eviscerates the meaning of the terms "continued" and "carry," which expand the application of section 265(2) beyond the possibly narrow limits of "incurred" and "purchase." In Constance M. Bishop, 41 T.C. 154, 160–161 (1963), affd. 342 F.2d 757 (6th Cir. 1965) where, although the purchase of the tax-exempt securities was traceable to the debt, the Tax Court analyzed the significance of the term "continued":

> * * * She continued the loan instead of repaying it with the proceeds of the sale of the non-tax-exempt securities, so that she would have the funds to purchase and hold tax-exempt securities. This, we consider to be continuing the loan to purchase and carry the tax-exempt securities.

The facts in the case at bar can be distinguished from those in *Bishop*, supra, but the reasoning by Judge Scott, which was not limited to an identification or tracing of the debt to the purchase of tax-exempt securities, extends logically to this case, supporting the careful distinction between "incurred" and "continued" which plaintiff seeks to ignore. The real issue here is whether the remaining loan, regardless of its size of correlation with the cost basis of other assets, was continued for the purpose of enabling plaintiff to own the Series "B" bonds of the city of Venice. Of course, the resolu-

tion of this issue requires a connection-type inquiry, which will be somewhat different from the inquiry into situations where the issue is whether indebtedness was incurred to purchase tax-exempt bonds. It is necessary to establish a sufficiently direct relationship of the continuance of the debt for the purpose of carrying the tax-exempt bonds.

■■ If the loan was needed to sustain plaintiff's business operation rather than its ownership of tax-exempt securities, the prohibitory features of section 265(2) will not apply. R. B. George Machinery Co., 26 B.T.A. 594 (1932); Sioux Falls Metal Culvert Co., 26 B.T.A. 1324 (1932). In this vein, counsel for plaintiff has argued that the loan was needed to supply the operating capital for the nascent enterprise, which needed such support until long-term financing could be arranged. There is little doubt that capital had to be found. The loan was one source of funds, and the municipal bonds were another. Although it received one offer to purchase at least $1,800,000 par value of the bonds for cash and the remaining $6,000,000 par value for cash or substituted securities, plus several earlier inquiries which contained tentative, minimum-price suggestions, plaintiff refused to accept the offer or enter into negotiations with the other inquirers. Plaintiff could have sold some or all of the remaining bonds if it had wished to do so. It was within plaintiff's power to liquidate some or all of its bondholdings and use the proceeds to reduce the outstanding debt without withdrawing any capital which was committed to, or held in reserve for, the corporation's activities. Thus, a loan was not the only source of funds and was not required by the dictates of successful corporate finance, but rather it was chosen by plaintiff as a more desirable source of funds than the municipal bonds. Plaintiff's argument fails for lack of purity of purpose in maintaining the loan, because it was continued out of a concern for preserving the bondholdings, which could be accomplished only if the debt financed the plaintiff's operations.

■ Plaintiff has cited R. B. George Machinery Co. and Sioux Falls Metal Culvert Co., supra, as authorities in support of its contention that interest on debts incurred for the purpose of carrying on the business functions of the taxpayer does not come within the aegis of section 265(2). These cases are distinguishable, however, because there the state securities could not be liquidated and, hence, the taxpayers had no alternative for supplying their cash needs but to borrow money. That is not the case at bar, where plaintiff could have liquidated its bondholdings. What plaintiff seeks to do is to receive tax-free income and at the same time deduct the interest expense attributable to obtaining that tax-free income. This is the double benefit prohibited by section 265(2). A business cannot escape taxation of income by the device of purchasing or carrying tax-exempt securities with borrowed money not required to carry on its regular functions. *Bishop,* supra; Denman v. Slayton, 282 U.S. 514, 519–520, 51 S.Ct. 269, 75 L.Ed. 500 (1931).

Plaintiff cannot take refuge behind Rev.Rul. 55–389, 1955–1 CUM.BULL. 276, where a deduction was recognized for interest on outstanding debentures despite the taxpayer's investment of the funds in tax-exempt securities. The ruling emphasized the delays in constructing plant facilities and recognized that the debentures were issued in order to refinance other indebtedness, furnish working capital, and finance contemplated plant expansion, and that the investment in tax-exempt securities was but temporary and pending the delivery of supplies and materials. In the instant case, the Series "B" bonds of the city of Venice have a 40-year life span and plaintiff has not given the slightest indication that it intended to sell any more before they are recalled. This distinguishes the revenue ruling, with its accent on the transitory, from the present case and plaintiff's apparently deep-rooted desire to hold onto the bonds.

■ Nor can plaintiff find succor in the absence of tax-exempt interest pay-

ments on the bonds in 1959;[1] what matters is the fact that the securities are tax-exempt and not whether the taxpayer actually paid any taxes on the income from those securities. Clyde C. Pierce Corp. v. Commissioner of Internal Revenue, 120 F.2d 206, 208 (5th Cir. 1941).

On the other hand, plaintiff has argued that the bonds were pivotal to obtaining an A-quality rating from Standard & Poor's for the proposed Series "A" bond issue, thereby lowering the interest cost and possibly increasing the marketability of the Series "A" bonds. These facts have been established. Plaintiff argues from them that section 265(2) will not apply because the continuing existence of the bonds, vis-a-vis their liquidation, was vital if they were to be pledged as security. In order to finance these tax-exempt bonds, which were unquestionably valuable as security for the Series "A" bond issue, plaintiff reasons that continuation of the debt was the only logical course of action. This argument is wide of the mark, however, because the fact that the bonds were instrumental in getting the higher Standard & Poor's rating is not determinative; the issue is whether the indebtedness was continued in order to carry the bonds and the beneficial use of those bonds (absent a showing of essentiality) says little about this central issue. The bonds, like any recognizable asset, were put to use as security (on the Series "A" bond issue). Any bondholdings, or any asset, including cash, could be put to similar use, and the efficient use of an available asset cannot, of itself, help a taxpayer to avoid the stricture of section 265(2). Also, the character of the longterm financing sprang from the size of the extant debt. Plaintiff's argument here is premised on the existence of the debt, but it is the very enormity of the debt which is being questioned, and to say that a large part of the debt was needed because it enabled an asset to be security for the refinanc-

ing of that debt is circular, to say the least.

In addition, plaintiff argues that the bonds were valuable because they permitted plaintiff to control any alteration in their terms which might be initiated by the City Council of Venice, and because access to the bridge was important inasmuch as it was a key facility for transriver shipments. This argument is susceptible to the same criticism as pertained earlier to the use of the Series "B" bonds as security for the Series "A" bond issue. What is important here is whether the indebtedness was continued in order to hold the bonds, not the uses to which the bonds might be put. Moreover, the language of the bond ordinance appears to protect plaintiff fully against any adverse modification of the ordinance. In any event, plaintiff has a renewable 50-year lease of the rail facilities on the bridge. There is no indication that plaintiff needs the bonds in order to use the bridge or to protect its interest in the bridge.

In oral argument before the court, plaintiff expressed the fear that a decision for defendant in this case would jeopardize the deductibility of interest payments on homeowner mortgage indebtedness for taxpayers whose portfolios include tax-exempt bonds. This is a legitimate concern. Congress has rejected a test which would in all cases deny deductibility of interest to the extent of a taxpayer's tax-exempt holdings. See Comm.R. and Cong.Discussion, pp. 728, 729, Seidmen, Legis.Hist. of Fed. Inc.Tax Laws (1938–1961). A relationship must be shown, and, in the relatively few cases which could not be settled administratively, it has been the task of the courts to define the relationship and apply it to the facts. This is an area of tax law in which it is more difficult to define the legal standard than it is to pass on a particular fact setting. Here, the total impression given by the evidence leads to the conclusion that the

---

1. The bonds expressly provided that no interest would be paid in the first two years.

taxpayer had the forbidden purpose. In another case, the impression will be different. The impression here, however, is not devoid of standards. There is an obvious relationship between the debt and the tax-exempt bonds and it is apparent that continuation of the indebtedness was not necessary other than for the purpose of continuing to hold the bonds. There were undoubtedly good business reasons for holding the bonds apart from the favorable tax aspects, but the latter dominated. This conclusion need not jeopardize the taxpayer whose dominant reasons for continuing indebtedness are unrelated to carrying tax-exempt bonds.

Plaintiff's claim for refund must be denied, and its petition is, accordingly, dismissed.