Ogden PHIPPS and Lillian B. Phipps

v.

The UNITED STATES.

No. 109–72.

United States Court of Claims.

April 16, 1975.

Kenneth L. MacCardle, New York City, for plaintiff. Irving H. Bull, New York City, attorney of record. Dunnington, Bartholow & Miller, New York City, of counsel.

Scott P. Crampton, Asst. Atty. Gen., for defendant. Allan C. Lewis, Washington, D. C., of counsel.

Before COWEN, Chief Judge, and DAVIS, SKELTON, NICHOLS, KASHIWA, KUNZIG and BENNETT, Judges.

## ON PLAINTIFFS' MOTION AND DEFENDANT'S CROSS MOTION FOR SUMMARY JUDGMENT

NICHOLS, Judge:

This suit arises out of disputes over the tax consequences of Ogden Phipps' partnership agreements in Smith, Barney & Co., for 1959 and for 1960–63. The business was underwriting the sale of securities and acting as a broker and dealer in securities. Lillian B. Phipps is a party solely because she signed joint tax returns with her husband for the 1959–1963 tax years involved. Although the case is presented as a single case for purposes of cross motions for summary judgment, since 1959 involves one partnership agreement and 1960–63 involves another, we deal with each agreement and its tax consequences separately. The IRS has made a disallowance for each year under IRC of 1954, § 265(2). Plaintiff has paid and sues for refunds.

### I

■ The agreement in effect in 1959 has been previously construed in Phipps v. United States, 414 F.2d 1366, 188 Ct.Cl. 531 (1969), (hereinafter Phipps I), having been the same one in effect in 1958, one of the tax years there involved. We agree with plaintiff that collateral estoppel applies here and hold again for the plaintiff, since in regard to the 1959 agreement the Government has shown no change of facts or applicable law as required by Commissioner of Internal Revenue v. Sunnen, 333 U.S. 591, 68 S.Ct. 715, 92 L.Ed. 898 (1948), to lift the ban on relitigating the same issue. United States v. Basye, 410 U.S. 441, 93 S.Ct. 1080, 35 L.Ed.2d 412 (1973), is relied on by the Government for this, but the Court concludes at 457, 93 S.Ct. at 1089:

> In summary, we find this case controlled by familiar and long-settled principles of income and partnership taxation. * * *

The case involved partnership income, but not the deduction of interest on indebtedness incurred to carry tax-exempt securities which was the problem in the first Phipps case and again here.

■ As a matter of interest, we note that the Phipps I opinion cites and quotes extensively from John E. Leslie, 50 T.C. 11 (1968). The very day before Phipps was handed down the Second Circuit reversed Leslie sub nom., Leslie v. Commissioner of Internal Revenue, 413 F.2d 636 (1969), cert. denied, 396 U.S. 1007, 90 S.Ct. 564, 24 L.Ed.2d 500 (1970). This does not effect a change in the "legal atmosphere" sufficient to avoid a collateral estoppel because the quoted material from the Tax Court opinion consisted of a summary of legislative history, plus a statement of general principles, neither of which is disputed or shown to be incorrect in the Circuit Judge's opinion.

### II

■ Under Commissioner of Internal Revenue v. Sunnen, collateral estoppel does not carry the interpretation of one written agreement over to another, even when the terms are much the same. The 1960–63 agreements are, however, so different insofar as plaintiff is concerned, that even stare decisis would not excuse us from a careful re-examination of their tax consequences. The legal issue as to those years, that we consider decisive, is whether IRC of 1954, § 265(2) requires that interest paid by the partnership to banks on loans, secured by pledge of plaintiffs' tax-exempt securities, must be included in plaintiffs' net income. So far as pertinent, the statute reads: "No deduction shall be allowed for— * * * (2) *Interest*. Interest on indebtedness incurred or continued to purchase or carry obligations * * * the interest on which is wholly exempt from the taxes imposed by this subtitle. * * * "

### III

■ Plaintiff, a former general partner, was for the tax years involved here a limited partner of Smith, Barney & Co., a New York firm organized as a

limited partnership under New York law and having membership rights through its partners on the New York Stock Exchange (NYSE), the American Stock Exchange, the Philadelphia-Baltimore Stock Exchange, the Midwest Stock Exchange, and the Pacific Coast Stock Exchange. There were several classes of partners in the firm: (1) ordinary general partners, (2) five "deep pockets" general partners (who underwrote all losses in excess of $1,000,000), (3) retired limited partners (former general partners with guaranteed retirement incomes of at least $18,000 annually), (4) cash-contributing limited partners, (5) securities-contributing limited partners (of whom Phipps, plaintiff here, was one), and (6) partners who contributed stock exchange memberships.

It appears that Mr. Phipps' contribution to the partnership for the years in question was primarily a personal note secured by pledge of securities for the firm's use. NYSE Rule 325 (which limits members' amount of business and available customer loan capacity to 2000 percent of the members' "net capital") creates a situation where member firms are always in need of additional working capital. Thus, in addition to the general capital and limited capital contributions by the partners, such as Phipps' limited capital, the firms also seek various ways to include partners' non-capital, individual trading accounts' assets in "net capital"—without otherwise depriving individual members of legal and beneficial ownership of these individual trading accounts. (Shearson, Hammil & Co. v. State Tax Commission, 19 A.D.2d 245, 241 N.Y.S.2d 764 (1963), aff'd, 15 N.Y.2d 608, 255 N.Y.S.2d 657, 203 N.E.2d 912 (1964), which exempted these trading accounts from the New York Unincorporated Business Tax, provides additional information on the operation of these trading accounts.)

Mr. Phipps' capital contribution was supplied in the form of a Limited Capital Note—a demand, non-negotiable note—secured at 100% face value by readily marketable securities. In Phipps' case,

tax-exempt securities (such as Section 103 state and municipal bonds) were used. These securities were placed in a pledge account with the firm. Phipps was required to maintain at least 100% face value of his note in securities with an equal fair market value and also meeting a 90% "capital requirements value" as defined by NYSE rules for measuring "net capital". Any appreciation or other excess above this two-fold valuation test could be withdrawn. The partnership paid Mr. Phipps 5% per annum on his capital contribution. The partnership paid interest on bank loans secured by plaintiffs' tax-exempts as follows:

| | |
|---|---|
| 1960 | $10,183.22 |
| 1961 | 9,125.00 |
| 1962 | 9,000.00 |
| 1963 | 9,000.00 |

The partnership deducted these amounts from the 5% payments to Mr. Phipps, paying him only a net figure.

The provisions of the partnership agreement we consider decisive, Articles IV, V and XI of the 1960 partnership agreement, are attached hereto as an appendix. They were in effect for the tax years 1960–1963, inclusive. A limited partner such as Phipps was to be "paid" 5% on the value of his note, as an expense of the business, whether or not earned, plus an additional 1% if earned. He remained owner of the pledged securities and entitled to the income resulting from them. The partnership might pledge the securities to secure its own obligations. The partnership could take as a credit on the 5% and the 1% if earned, the interest it was required to pay on loans secured by the pledged securities. If any item of "income, gain, loss, deduction or credit" with respect to pledged securities should be treated for tax purposes as received or incurred by the partnership, each such item should be "distributable entirely and solely to the partner who pledged" the securities. This last provision, in Article XI(a) had no counterpart in the agreement construed in our previous *Phipps* I decision.

It is defendant's interpretation of the present agreement that the partnership considered it was paying Mr. Phipps 5% at all events, either directly or in the form of a credit for the interest to banks. Since the arrangement permitted Mr. Phipps to contribute his tax-exempts to the partnership working capital, yet still enjoy their fruits, it was only fair he should pay the cost of the bank loans that made the arrangement possible. Had he chosen, as he might have, to contribute cash, there would have been no fruits, and on the other hand, no interest to the banks. The bank interest was incurred to preserve the fruits, *i. e.*, for Mr. Phipps' benefit. It was therefore clearly expected that interest payments made to carry the pledged securities should not fall on the partnership or on the general partners who shared the partnership profit (except the 1%) and loss, but solely on the limited partner who was enjoying the aforementioned fruits.

In *Phipps* I, we held for plaintiff because, assuming *arguendo* that § 265(2) mandated a disallowance of the interest paid the banks, we did not see why the burden of the disallowance fell on the plaintiff rather than on the partners who enjoyed the profits and bore the losses. Here we are given a reason why.

### IV

We considered § 265(2) in Illinois Terminal RR v. United States, 375 F.2d 1016, 179 Ct.Cl. 674 (1967). We reasoned that it was not enough for a § 265(2) disallowance of the interest deduction that a taxpayer coincidentally held tax-exempt securities. There must be a nexus between the interest payments and the securities held, a "relationship". The purpose, or the dominant purpose if there is more than one, for incurring the debt must be to carry the securities. This purpose test has been applied by other courts. Leslie v. Commissioner of Internal Revenue *supra* ; Wynn v. United States, 288 F.Supp. 797 (E.D.Pa.1968), aff'd per curiam, 411 F.2d 614 (3d Cir. 1969), cert. denied, 396 U.S. 1008, 90

S.Ct. 565, 24 L.Ed.2d 500 (1970); Wisconsin Cheeseman v. United States, 388 F.2d 420 (7th Cir. 1968). In the latter two cases, as here, the securities were used as collateral for the loans, obviously a close and intimate relationship. Phipps, evidently a wealthy man, could have contributed working capital in several different ways, and he enjoyed that option under the Articles too. The selection of the tax-exempts obviously had a tax purpose. The case is, in that aspect not nearly as close as *Illinois Terminal.*

Rev.Proc. 72–18 (Sec. 3.03), 1972–1 Cum.Bull. 740, says that:

> Direct evidence of a purpose to *carry* tax-exempt obligations exists where tax-exempt obligations are used as collateral for indebtedness. * * * (Emphasis in original.)

In the presence of direct evidence, it is not necessary, as it was in *Illinois Terminal RR. Co., supra*, to search and analyze the record for indirect evidence.

### V

If Mr. Phipps had pledged ordinary securities, whose interest was taxable, we believe under Article V he would have been deemed to have received as income the full 5% without reduction. He was entitled to be:

> "*paid* for each full year * * * an amount equal to 5% per annum." (Emphasis supplied.)

By Treasury Regulation on Income Tax, § 1.702–1(a):

> * * * Each partner is required to take into account separately in his return his distributive share, whether or not distributed, of each class or item of partnership * * * gain, loss, deduction, or credit * * * [including] * * *
>
> * * * * * *
>
> (8)(i) * * * any items of income, gain, loss, deduction, or credit subject to a special allocation under the partnership agreement which differs from the allocation of partnership taxable income or loss generally.

* * * * * *

The interest payments to the banks are called "credits" against the limited partner's 5%, in Article V, and Article XI(a) clearly tracks the above quoted "special allocation" provision. The washing out of an offset claim as part of "payment" is not new or unfamiliar to the tax law. *See, e. g.,* Commissioner of Internal Revenue v. Hansen, 360 U.S. 446, 79 S.Ct. 1270, 3 L.Ed.2d 1360 (1958), (in which an item is deemed accruable under the "all events" test if at all events it will either be paid in cash or offset against anticipated future liabilities). *See* also, Lawyers Title Guaranty Fund v. United States, 508 F.2d 1 (Fifth Cir., 1975). By IRC of 1954, § 61(a)(12), the discharge of indebtedness is includable as income.

Plaintiff has furnished an affidavit issued by Smith, Barney & Company's then Chief Account describing its accounting and tax reporting procedure. Even if we were to accept the affidavit in its entirety as true, that would not change the result in this case. Although the affidavit indicates that the partnership did not report on its returns for the subject years any amount of the interest deduction as having been specially allocated to the plaintiff, such an allocation is in fact what actually occurred even though not reported as such. When the interest expense paid on loans secured by plaintiff's securities was deducted from plaintiff's 5 percent per annum to arrive at the sum which the partnership owned plaintiff, this was the allocation. This subtraction was provided for in the partnership agreement. The affidavit, incidentally, acknowledges this subtraction in paragraph eight thereof. The erroneous treatment by the partnership of the amounts in controversy cannot change the legal effect under section 265(2) of the express terms of the partnership agreement as shown by the above analysis.

Having the full 5% imputed to him, Mr. Phipps would, of course, in the ordinary case have the interest deduction imputed to him also, as Article XI(a) clearly requires, and he could take it as a deduction on his return.

Since the interest deduction, if allowable, would belong to Mr. Phipps, it is clear the burden of any disallowance would fall on him also. We have shown under Part IV that the interest here involved was paid to "carry" the tax-exempts within the meaning of § 265(2). It follows that Mr. Phipps is taxable for the full 5% without deduction for the interest, with respect to his 1960–63 tax years, the 5% being made up of the sums actually paid him and "credit" taken on account of his obligation to relieve the partnership of the interest paid the banks.

In regard to tax year 1959, summary judgment is granted to plaintiff and the case is remanded to the trial division for a determination of recovery pursuant to Rule 131(c), since the record does not adequately state the full amount of back taxes, penalties, and interest to be refunded.

In regard to tax years 1960–63, summary judgment is granted to defendant and the petition is dismissed.

SKELTON, Judge, joined by BENNETT, Judge, concurring in part and dissenting in part:

I concur with that part of the court's opinion that holds that plaintiff is entitled to a refund of the income taxes claimed by him for 1959 on the basis of collateral estoppel by reason of our decision in Phipps v. United States, 414 F.2d 1366, 188 Ct.Cl. 531 (1969) (hereinafter *Phipps I*). In fact, I think plaintiff is entitled to recover the 1959 taxes on the merits, because *Phipps I* was correctly decided. However, I disagree with that part of the opinion that denies to plaintiff a refund for the claimed taxes for 1960, 1961, 1962, and 1963. In my opinion, the plaintiff is entitled to a refund of such taxes for those years under the doctrine of *stare decisis,* as well as on the law and the facts on the merits of the case, as shown below.

As to *stare decisis,* both plaintiff and defendant agree that there is no differ-

ence between plaintiff's claims for 1960–1963 and his claim for 1959. In defendant's brief, in support of its motion for summary judgment, we find the following statements:

The situation for 1960 through 1963 is not different in substance from that for 1959. [*Id.* at 32.]

\* \* \* \* \* \*

There is no difference between taxpayer's claims for 1960 through 1963 and his claim for 1959. [*Id.* at 36.]

In my opinion, the defendant is correct in saying there is no difference between plaintiff's claims for 1960 through 1963 and his claim for 1959. The court has allowed plaintiff's claim for 1959 on the basis of *Phipps I* because of collateral estoppel. By such action, the court has affirmed and approved its holding in *Phipps I.* Even if collateral estoppel is not applicable to plaintiff's claims for 1960–1963 because of minor changes in the partnership agreements for those years, *stare decisis* is applicable. Consequently, since the claims for 1960–1963 are the same as those for 1959, which the court decides in favor of plaintiff because of *Phipps I*, the plaintiff is also entitled to recover for the years 1960–1963 on the doctrine of *stare decisis.* This is true because *Phipps I* has not been overruled.

But we do not have to stop here. The plaintiff is entitled to recover on the merits the refund he claims for the years 1960–1963. The court has erroneously denied him recovery of the refund for those years on the basis of Section 265(2) of the Internal Revenue Code of 1954 which provides that no deduction shall be allowed for interest on indebtedness incurred or continued to purchase or carry obligations, the interest on which is wholly exempt from taxes. In this case, no one contends that plaintiff has borrowed any money to *purchase* tax exempt securities. Consequently, the only question is whether or not he has borrowed money to *carry* tax exempt securities. The word "to" in the statute has been construed to mean "for the purpose of" (purchasing or carrying tax exempt securities). *See* Phipps v. United States, *supra*, 414 F.2d at 1372, 188 Ct.Cl. at 539. This question has already been decided in favor of the plaintiff in *Phipps I* as follows:

Taxpayer has not incurred any indebtedness to continue to carry his tax exempt securities, the essence of section 265(2). The loan agreement was made by the partnership for its benefit, to obtain working capital. The interest deduction, if denied, should affect the partnership's profits and all partners, proportionately. Section 265(2), in its present form, cannot be stretched to encompass the instant case. On the unique facts as stipulated before us, plaintiff is entitled to recover. [414 F.2d at 1374, 188 Ct.Cl. at 543.]

We are bound by this decision under the doctrine of *stare decisis.* However, we do not have to rest our decision on that doctrine alone, even though it appears to be conclusive in this case.

Other courts that have considered the problem before us have stated that before a tax can be imposed on a taxpayer by reason of Section 265(2) of the Code, it must be shown that money borrowed by the taxpayer was for the purpose of *carrying* the tax exempt securities. This question was considered by the Tax Court in the case of R. B. George Machinery Co., 26 B.T.A. 594 (1932), in connection with the predecessor of Section 265(2) containing identical language. There the taxpayer had sold machinery to the State of Texas but had to accept warrants bearing seven percent interest in payment because the State did not have the money to pay for the machinery. He borrowed money from a bank at seven percent interest and pledged the warrants as security. Later, taxpayer deducted the interest he paid the bank from his income tax. The Commissioner of Internal Revenue disallowed the deduction, claiming, as here, that the money borrowed from the bank was for the purpose of carrying the tax exempt State warrants. The Tax Court decided

the case in favor of the taxpayer, saying:

> The parties have proceeded on the theory that the money obtained from the bank by petitioner was a loan, with the deficiency warrants of the state and its political subdivisions being hyphthecated (sic) as security therefor. This we think is the correct approach. Prior to the transaction in question the various state and municipal obligations had become the property of petitioner and were fully paid for by it, as they represented payments to petitioner for machinery sold to the state and its subdivisions. It is quite apparent, then, that the money advanced to the petitioner on the warrants did not represent "indebtedness incurred or continued to purchase * * * obligations or securities * * * the interest upon which is wholly exempt from taxation * *." This brings us to the real question, and that is, Was the interest here in controversy interest paid on "indebtedness incurred or continued * * * to *carry* obligations or securities * * the interest upon which is wholly exempt from taxation?" [Emphasis in original.]

> *         *         *         *         *         *

> The statute was manifestly designed to prevent the purchaser of tax-exempt securities from deducting interest paid for borrowed money, which money was used to acquire securities the interest on which could not be taxed by the Federal Government. Denman v. Slayton, *supra*. [282 U.S. 514, 51 S.Ct. 269, 75 L.Ed. 500 (1931).] We think the exception in the statute should not be construed more broadly than to effect its obvious purpose. *It was not intended to penalize legitimate business or to deny to it the right to deduct interest paid for borrowed money, which money was used for the purpose of carrying on its regular functions. The warrants held by petitioner were received in payment for goods sold and they were appar-*

*ently given because the state or its subdivisions could not at the time pay cash.* They in no true sense of the word represented investments by petitioner, as it preferred at all times to get its cash out of them. The fact that in making the loan the petitioner hypothecated the warrants does not alter the fact as stipulated that the cash as borrowed was for the purpose of operating its business. *It was not used to buy or secure the warrants in any sense of the word.*

> It follows that interest paid by petitioner in the amount of $13,543.04 constitutes a proper deduction. [26 B.T.A. at 597–98.] [Emphasis supplied.]

In a similar case, the Tax Court held in Sioux Falls Metal Culvert Co., 26 B.T.A. 1324 (1932):

> The remaining question, as to whether amounts paid to the bank in the taxable years represent interest paid on indebtedness incurred or continued to carry tax-exempt securities, has heretofore been decided in R. B. George Machinery Co., 26 B.T.A. 594, where we held that warrants, similar to those involved in the instant proceeding, received in payment for machinery and used as security for a loan, were received and carried as an incident to petitioner's business, and that the interest paid was deductible. Upon authority of our decision in that case we hold that the petitioner is entitled to deduct as interest expense the amounts paid to the Minnehaha National Bank. [*Id.* at 1327–28.]

All of the cases that have passed on the question before us, including those cases where the decisions have been adverse to the taxpayers, the courts have held that there must be a *direct relationship* between the money borrowed and the *carrying* of the securities before the taxpayer will be denied the interest deduction. For instance, in Leslie v. Commissioner of Internal Revenue, 2 Cir., 413 F.2d 636 (1969), the court said:

> Although simple to state, the "purpose" test is difficult to apply in prac-

tice. Certainly where borrowed funds are used directly to purchase tax-exempt securities, there can be no dispute as to the application of the statute. Drybrough v. C. I. R., 376 F.2d 350 (6th Cir. 1967). However, where business reasons not related to purchase of tax-exempt securities dominate the incurring of indebtedness, taxpayer is entitled to deduct the interest on the indebtedness. Wisconsin Cheeseman, Inc. v. United States, 388 F.2d 420 (7th Cir. 1968). The court in *Wisconsin* refused to accept the argument that "a reasonable person would sacrifice liquidity and security by selling municipals in lieu of incurring mortgage debt to finance a new plant." 388 F.2d at 423. Thus as to the taxpayer's borrowing to build a new plant, the loan for which was secured by a mortgage on the real estate, the court did not find a sufficiently direct relationship. However, the court disallowed the deduction with respect to the taxpayer's seasonal bank borrowings, the collateral for which was tax-exempt securities.

\* \* \* \* \* \*

\* \* \* A more appropriate interpretation of Section 265(2) is whether or not there is a business "purpose" to purchase or carry obligations the interest on which is exempt, and to incur indebtedness therefor. Cf. Wynn v. United States, 288 F.Supp. 797 at 802 (E.D.Pa.1968), aff'd per curiam 411 F.2d 614 (3d Cir. 1969). [*Id.* at 639–40.]

In Wisconsin Cheeseman, Inc. v. United States, 388 F.2d 420 (7th Cir. 1968), the court held that there must be a direct relationship between the debt and the carrying of the bonds. The court said:

> In our view, the taxpayer is not *ipso facto* deprived of a deduction for interest on indebtedness while holding tax-exempt securities. The Government has not convinced us that interest deduction can be allowed only where the taxpayer shows that he

wanted to sell the tax-exempt securities but could not. For example, Congress certainly did not intend to deny deductibility to a taxpayer who holds salable municipals and takes out a mortgage to buy a home instead of selling the municipals. As the Court of Claims stated in Illinois Terminal Railroad Company v. United States, 375 F.2d 1016, 1021, 179 Ct.Cl. 674 (1967):

> "It is necessary [for the Commissioner] to establish a sufficiently direct relationship of the continuance of the debt for the purpose of carrying the tax-exempt bonds."

This construction flows from the use of "to" in Section 265(2). \* \* \* [*Id.* at 422.]

In that case the taxpayer owned tax-exempt securities which it pledged as security for short term loans. The court properly held that there was a direct connection between the debt and carrying the securities and denied the interest deduction on the debt by reason of Section 265(2) of the Code. However, the taxpayer borrowed additional money to build a plant during the time it owned the tax-exempt securities, which debt was secured by a mortgage on real estate. The IRS took the position that the taxpayer should have sold the tax-exempt securities to obtain money to build the plant and for that reason concluded that the mortgage secured debt was for the purpose of carrying the securities, and, accordingly, denied a deduction for the interest on the debt. The court held in favor of the taxpayer, saying that section 265(2) was not a mechanical formula and if the debt was for a legitimate business purpose and had an insufficient relationship to the holding of the securities, the mortgage deductions must be allowed. In this connection the court said:

> \* \* \* Section 265(2) was not intended to operate as a "mechanical rule." Here we are not applying a mechanical rule but are insisting upon a connection between the tax-exempt

securities and the loans before interest deductibility is disallowed.

\*     \*     \*     \*     \*     \*

\* \* \* *Business reasons dominated the mortgaging of the property. Therefore, we are unwilling to accept the Commissioner's view that taxpayer should have liquidated municipals instead of obtaining a real estate mortgage loan. There is an insufficient relationship between the mortgage indebtedness and the holding of the municipal bonds to justify denial of deduction of the mortgage interest.* For non-deductibility, we have seen that *the Commissioner must establish a sufficiently direct relationship between the debt and the carrying of the tax-exempt bonds. That has not been done as to the mortgage, so that the mortgage interest deductions must be allowed under Section 163(a) of the Internal Revenue Code. [Id.* at 423.] [Emphasis supplied.]

The foregoing opinion was quoted with approval by the court in Wynn v. United States, 288 F.Supp. 797 (E.D.Pa. 1968), aff'd per curiam, 411 F.2d 614 (3d Cir. 1969), when it held:

On appeal, the Court of Appeals held that the test to be applied was not solely whether the taxpayer *held* tax exempts at the time he incurred the obligation the interest on which he sought to deduct, but rather the Commissioner had to establish a reasonably close relationship between the incurring of such obligation and the *purpose* "to purchase or carry" the tax exempts. \* \* \*

\* \* \* [T]he Court found that there was insufficient relationship between borrowing for a one-time, large capital expenditure, of a kind usually financed by mortgage secured borrowing and the continued holding of tax exempt securities—especially when selling off the securities and using the proceeds for the plant expansion would have seriously jeopardized taxpayer's liquidity position. With respect to the mortgage interest, the Court held that:

" \* \* \* Business reasons dominated the mortgaging of the property. Therefore, we are unwilling to accept the Commissioner's view that taxpayer should have liquidated municipals instead of obtaining a real estate mortgage loan. There is an insufficient relationship between the mortgage indebtedness and the holding of the municipal bonds to justify denial of deduction of the mortgage interest. \* \* \* " [Emphasis in original.] [*Id.* at 800.]

In that case, the court went on to say:

That the "purpose" or "relationship" tests are to be applied to the intent to purchase or carry the tax exempt securities themselves, rather than to obtain the interest is further borne out by the legislative history. \* \* \* Thus, even where a taxpayer might earn tax exempt interest with the proceeds of borrowing, *if the money was not borrowed for the purpose of purchasing or carrying tax exempt bonds he would get the double advantage of both a tax deduction for the interest expense and no tax on the interest earned.*[7]

[7] The Commissioner, too, has ruled that where a business borrowed money for business purposes, and during a delay before the actual expenditure was made invested in tax exempt securities, the taxpayer was not denied a deduction for the interest on the borrowed funds. Rev.Rul. 55–389, C.B. 1951–1, 276. [Emphasis supplied.] [*Id.* at 802.]

In Illinois Terminal RR Co. v. United States, 375 F.2d 1016, 179 Ct.Cl. 674, (1967), in an opinion written by Commissioner Marion T. Bennett (now Judge Bennett of this court) we held:

\* \* \* It is necessary to establish a sufficiently direct relationship of the continuance of the debt for the purpose of carrying the tax-exempt bonds.

*If the loan was needed to sustain plaintiff's business operation rather than its ownership of tax-exempt securities, the prohibitory features of section 265(2) will not apply.* R. B. George Machinery Co., 26 B.T.A. 594 (1932); Sioux Falls Metal Culvert Co.,

26 B.T.A. 1324 (1932). * * * [Emphasis supplied.] [*Id.* 375 F.2d at 1021, 179 Ct.Cl. at 683.]

This brings us to the fact of the instant case. In *Phipps* I we stated:

Taxpayer has not incurred any indebtedness to continue to carry his tax exempt securities, the essence of section 265(2). The loan agreement was made by the partnership for its benefit, to obtain working capital. * * * [414 F.2d at 1374, 188 Ct.Cl. at 543.]

The same facts exist in the instant case. The loan was made by the partnership for the legitimate business purpose of obtaining working capital in order to comply with the stock market regulations. The loan had nothing whatever to do with carrying plaintiff's tax-exempt securities. The plaintiff had nothing to do with making the loan. Furthermore, the partnership did not own the bonds and was not entitled to the tax-exempt interest derived therefrom. These facts fit squarely within the foregoing authorities to the effect that where the loan is made for a legitimate business purpose without any direct relationship with the carrying of tax-exempt securities, the interest deduction must be allowed. That is the situation in this case.

In the instant case, the plaintiff was a wealthy man, which is acknowledged by the court's opinion. When he showed that he owned the securities free of debt and that he did not borrow any money with the securities as collateral, the burden was on the Commissioner "to establish a sufficiently direct relationship between the debt [of the partnership] and the carrying of the tax-exempt bonds." The courts so held in Wisconsin Cheeseman, Inc. v. United States, *supra*, and Wynn v. United States, *supra*. The Commissioner wholly failed to discharge this burden in this case.

While Section 265(2) of the Code as interpreted and applied by the foregoing authorities is decisive of this case in favor of the plaintiff, the defendant has confused the issue by its "allocation" argument. It contends by hypothetical, conjectural and circuitous reasoning that somehow paragraphs IV, V, and XI(a) of the partnership agreements in force for the years 1960–1963 allocate the interest paid by the partnership on its loan in such a way that plaintiff should be deemed to have reimbursed the partnership for the interest on such loan and by reason thereof the loan was made to *carry* plaintiff's tax-exempt securities. This argument is made notwithstanding the fact that plaintiff owned the securities outright, free of debt, and had nothing to do with making the loan, and even though the partnership created the debt for a legitimate business purpose (*i.e.*, to get working capital) that had no direct relationship to the carrying of plaintiff's tax-exempt securities. This same allocation argument was made by defendant in *Phipps I*, which was rejected by the court. In that case paragraphs IV and V involved here were in all material respects present in the agreements for 1958 and prior years. The only new paragraph in the agreement in the instant case on which defendant relies for its allocation argument is XI(a) which is as follows:

(a) If any item of income, gain, loss, deduction or credit in respect of particular securities or other property placed by a Partner in his Pledge Account should for tax purposes be treated as received or incurred by the Partnership, each such item shall be distributable entirely and solely to the Partner who so pledged such securities or other property.

The defendant says that paragraph XI(a), together with paragraphs IV and V of the agreement, required plaintiff to reimburse the partnership for the interest on its loan, and, therefore, the loan was made to *carry* plaintiff's tax-exempt securities. I cannot accept this kind of nebulous reasoning, especially when it is shown conclusively that plaintiff had nothing to do with the loan, did not need

it, did not in fact reimburse the partnership for the interest, and there was no direct relationship between the loan and carrying the securities. Furthermore, the loan was made for a legitimate business purpose to the partnership.

In my opinion, paragraph XI(a) does not allocate the interest on the partnership loan to the plaintiff. That paragraph must be considered in connection with the pertinent part of paragraph IV, which provides as follows:

> Each Partner shall pay all taxes, assessments or other charges upon or with respect to any securities or property in his Pledge Account and with respect to any transactions therein (whether upon liquidation thereof, or otherwise) or upon or with respect to the income therefrom or distributions thereon or the gain or loss in value thereof inuring to him.

When this is done, it is clear that the meaning of paragraphs XI(a) and IV is to require any partner who placed securities or other property in his Partnership Pledge Account to pay any loss, deduction, taxes, assessments, or other charges upon or with respect to any of such securities or other property even though the same should be treated as incurred by the partnership. For instance, the plaintiff here could have contributed real estate rental property instead of his note secured by the tax-exempt securities. In that case, the above provisions would have required him to pay real estate taxes, repair bills, fire losses, insurance premiums, and perhaps utility bills and charges of like character due on the pledged property, even though the bills were presented to the partnership as though it was the owner (*i.e.* "treated as incurred by the partnership"). The same is true with respect to plaintiff's tax-exempt securities here. Under this analysis, the meaning of these paragraphs appear to be quite simple and easily understood, although at first blush they appear to be very complicated. To carry the analysis further, the indicated paragraphs entitle the partner to any gain, income, or credit on or to the pledged property, even if paid to the partnership. For example, on pledged real estate rental property, the partner would be entitled to any increase in value, the rent paid by tenants, depreciation deduction, etc. The same is true with respect to gain or income on plaintiff's tax-exempt securities in the instant case.

It will be noted that there is nothing in these paragraphs or in paragraph V that requires the plaintiff to *reimburse* the partnership for any interest paid by the partnership on its business loans where a partner's pledged property is used as security or collateral. Furthermore, there is nothing in these paragraphs that *allocated* such interest to the plaintiff. Had the parties so intended, it would have been easy to provide for it. When the defendant construes these paragraphs, along with paragraph V, to mean that the interest was allocated to the plaintiff and that they required the plaintiff to reimburse the partnership for the interest paid by it to a bank on a business loan under the circumstances of this case, it appears that defendant is reading something into these paragraphs that is not there.

As a matter of fact, the affidavit of Smith, Barney and Company, accountants, shows that the partnership did not report on its returns for the years in question any amount of interest deduction that had been allocated to the plaintiff. This is proof that the parties did not contract for any such allocation and did not intend to do so. The defendant appears to have injected its allocation theory into this case as an "afterthought" idea that the parties never intended or even thought about. It is completely unrealistic and contrary to the facts.

I would grant plaintiff's motion for summary judgment and enter judgment for the plaintiff for a refund of the taxes for 1959–1963, together with interest, and remand the case to the trial judge

for a determination of the amount of recovery pursuant to Rule 131(c)(2); and I would deny defendant's cross-motion for summary judgment.

## APPENDIX

### IV.

### Partners' Pledge Accounts

The Partnership, as holder of Capital Notes or Limited Capital Notes and as pledgee of the property in the Pledge Accounts of the Partners shall have the following rights with respect to such property (without limiting any rights it may otherwise have as such holder and pledgee) :

*Partnership's Rights in Pledged Property*

(1) Securities in registered form in a Partner's Pledge Account may be held by the Partnership in such form as it may deem advisable, either in its own name or in the name of a nominee or nominees or in such Partner's name, in good delivery form.

(2) In the event that any Capital Note or Limited Capital Note of any Partner is not paid when due, the Partnership shall have the right to liquidate, to the extent that a majority in interest of the General Partners shall deem advisable, the property then in such Partner's Pledge Account, and to apply the proceeds of such liquidation, and/or any cash constituting part of the property in his Pledge Account, in payment, in whole or in part of the then unpaid principal amount of the Capital Notes or Limited Capital Notes of such Partner that are due. Any proceeds of liquidation not applied as aforesaid shall remain property in such Partner's Pledge Account, subject to the provisions of this Article. Any such liquidation may be effected by sale for cash, upon any exchange or in the over-the-counter market, or at any other public or private sale, without advertisement or notice, all as the Partnership in its sole discretion may determine. The purchaser of any property at any such sale shall take the same free of any right of redemption and of any other right or claim on the part of the Partner whose Pledge Account is being liquidated, all of which rights and claims are hereby waived and released. The Partnership or any other Partner may be the purchaser at such a sale only if the sale is made on an exchange. The net proceeds of any such liquidation sale shall be the proceeds remaining after payment of all expenses of such sale. If the Pledge Account of a Limited Partner is liquidated in full and if the Limited Capital Notes of such Limited Partner are not paid in full from the proceeds of such liquidation or otherwise, the Partnership may proceed against such Limited Partner to enforce payment of such Limited Capital Notes.

(3) The Partnership shall also have the right, without notice, to pledge, re-pledge, hypothecate or re-hypothecate any or all securities or other property in

any Partner's Pledge Account (separately or in common with other securities or any other property) to secure indebtedness of the Partnership in any amount (whether larger or smaller than the unpaid principal amount of the outstanding Capital Notes or Limited Capital Notes of such Partner) and without retaining a like amount of securities in the Partnership's possession or control; provided, however, that in the event that the Partnership is unable to release or return any securities or other property to such Partner when he shall be entitled to, and shall make demand for, such release or return, because of any such pledge, re-pledge, hypothecation or re-hypothecation, the market value of such securities or other property as of the date such demand is rightfully made shall be ascertained and such securities or other property shall be deemed to have been applied to the payment of the principal amount of the outstanding Capital Notes or Limited Capital Notes of such Partner, and if there shall be any excess of the market value, as of such date, of such securities or other property remaining after payment in full of all outstanding Capital Notes or Limited Capital Notes of such Partner, the Partnership shall promptly pay to such Partner an amount in cash equal to such excess. Such Partner's right to such securities or other property shall be deemed satisfied to the extent of the value of the securities or other property so applied or paid.

(4) The amount by which the principal amount of any Capital Note or Limited Capital Note of any Partner shall have been paid or satisfied, by use or application made or deemed to have been made of property in his Pledge Account or proceeds of any liquidation of property in his Pledge Account, or by any other payment by him or otherwise, shall be credited to such Partner's individual account in the case of a General Partner or to cash capital contribution in the case of a Limited Partner, reducing his capital contribution represented by notes, in the same manner as a voluntary payment of such Capital Note or Limited Capital Note.

(5) Each Partner shall pay all taxes, assessments or other charges upon or with respect to any securities or property in his Pledge Account and with respect to any transactions therein (whether upon liquidation thereof, or otherwise) or upon or with respect to the income therefrom or distributions thereon or the gain or loss in value thereof inuring to him.

Subject only to the pledge thereof and the rights of the Partnership therein as pledgee, as provided in this Article and in any Capital Notes or Limited Capital Notes, the property from time to time in a Partner's Pledge Account shall, until and unless liquidated by the Partnership in ac-

**Partner's Rights in Pledged Property**

cordance with the provisions of this Article, remain the property of the Partner pledging the same, and he shall have and retain full legal and beneficial ownership thereof and, without limiting the generality of the foregoing, shall have the benefit of any increase and bear the risk of any decrease in value and shall have the sole right to any and all income therefrom and distributions thereon. Such Partner, except when any of his Capital Notes or Limited Capital Notes are in default, shall have the right to direct the voting and exercise of other rights and privileges pertaining to the property in his Pledge Account, to direct sales of any such property and to direct purchases of any property from any cash in his Pledge Account (subject, in the case of a Limited Partner, to the right of a majority in interest of the General Partners to disapprove any such proposed purchase) ; provided, however, that the net proceeds of any such sale and any property so purchased shall be placed in such Partner's Pledge Account. Any Partner may at any time withdraw any property in his Pledge Account upon substitution therein of property (whether cash or other property) having a capital requirements value at least equal to the capital requirements value of the property to be released, provided that any property thus substituted by a Limited Partner must be satisfactory to the Partnership. Any property withdrawn from a Partner's Pledge Account pursuant to any provision of these Articles shall become the absolute property of such Partner and shall no longer be subject to any pledge hereunder. So long as no Capital Note or Limited Capital Note of a Partner is in default, there shall be released from such Partner's Pledge Account and paid over to him all interest and dividends (except dividends payable in securities and except partial or complete liquidating dividends) received with respect to property in such Partner's Pledge Account. When all Capital Notes or Limited Capital Notes of a Partner are paid in full, the Partnership shall have no right or interest of any kind in such Partner's Pledge Account or any property therein.

## V.

### Interest on Capital

**Interest on Limited Capital Contributions in Cash**    The limited capital contributions in cash (not including cash in Limited Partners' Pledge Accounts) shall bear interest at the rate of 5% per annum, payable quarterly during any continuance of the partnership, to be charged to and paid by the Partnership, whether or not earned, as an expense of the business.

Each Limited Partner who has contributed a Limited Capital Note or Notes to the capital of the Partnership shall be paid for each full year that he is a Limited Partner an amount equal to (or for any period of less than a full year, at the rate of) 5% per annum on the agreed value (as stated in Article II) of such Note or Notes while the same are outstanding; provided, however, that the Partnership may take as a credit against such amount, and against the additional amount, if any, payable in accordance with the fourth paragraph of this Article V, the interest which it is required to pay for such period on any loan or loans secured by property placed in such Limited Partner's Pledge Account. Any amount paid to a Limited Partner in accordance with the provisions of this paragraph shall be charged to and paid by the Partnership, whether or not earned, as an expense of the business. *(Interest on Limited Capital Contributions in Notes)*

The general capital contributions shall bear interest at the rate of 5% per annum, payable at the end of each calendar year during the term of the Partnership, but only to the extent that there shall be net profits for such year sufficient to pay the same as provided in Article VIII. *(Interest on General Capital)*

To the extent that the net profits of the Partnership for any calendar year, determined in accordance with Article VIII, exceed by more than $150,000 the amount necessary to pay interest on general capital contributions as hereinabove provided, additional interest in an amount not exceeding 1% per annum shall be paid on the limited and general capital contributions in cash and on the agreed value (as stated in Article II) of Limited Capital Notes contributed by a Limited Partner. Such additional interest for any calendar year shall be paid at the end of such year or as soon thereafter as convenient and shall be paid without priority of limited capital over general capital and general capital over limited capital. *(Additional Interest on Limited and General Capital)*

\*            \*            \*            \*            \*

# XI.

## General Accounting Provisions

Appropriate books of account shall be kept, and each Partner, whether Limited or General, shall have access to all books, records, and accounts of the Partnership. *(Books)*

**Statements of Accounts**   The accounts of the Partnership shall be ascertained and determined as of the close of business on the last day of each month during the continuance of the Partnership, and as of the close of business on December thirty-first of each year the books of account of the Partnership shall be closed and shall show the status of the accounts of the Partnership, including net profits and net losses, and shall also show the amounts of the general and limited capital contributions as they then stand on the books of the Partnership.

**Calculations of Capital**   The amount of the capital contribution of any Partner, at any time, shall be the amount of the capital contribution of such Partner set forth in Article II hereof, plus the amount (determined as provided in Articles II and III) of any additional capital contribution made since the date of these revised Articles and less any part of such contribution which shall have been withdrawn by such Partner since such date.

Interest payable to a Partner on his capital contribution shall be computed upon the amount of capital contribution standing to his credit upon the books of the Partnership from time to time during the year.

Except with respect to the distributive interests of withdrawn Partners determined in accordance with the provisions of Article XXI, the accounts of the Parnership, as ascertained and determined as of the end of each month and as of the end of each calendar year, shall be conclusive upon each Partner unless he shall make objection to the same in writing, delivered to the Partnership within sixty (60) days after the close of the month or the year for which such account is made, and, in the absence of such written objection, the correctness of such account shall not thereafter be questioned by any Partner or by his legal representatives.

Except as otherwise expressly provided in these Articles, in determining the accounts of the Partnership for all purposes, the assets and liabilities of the Partnership may be taken at such valuations as a majority in interest of the General Partners shall determine, and the Partnership may, but shall not be required to, set up reserves against doubtful accounts and contingent and unliquidated liabilities, including the indebtedness of any Partner to the Partnership.

**Income Tax Allocations**   For income tax purposes, and particularly for the purpose of Subchapter K of Chapter 1 of the Internal Revenue Code of 1954—

>   (a) If any item of income, gain, loss, deduction or credit in respect of particular securities or other property placed by a Partner in his Pledge Account should

for tax purposes be treated as received or incurred by the Partnership, each such item shall be distributable entirely and solely to the Partner who so pledged such securities or other property.

(*b*) Each item of Partnership income, gain, loss, deduction or credit in respect of each Partnership Investment or Corporate Affiliate shall respectively be distributable among the Partners as provided in said Article XII.

(*c*) If and to the extent that any payment treated under these Articles as an expense of the business or any payment designated under these Articles as interest, whether or not treated as an expense of the business, is for tax purposes treated as a distribution of partnership income, such distribution shall be deemed to have been made first out of items of taxable gross income not requiring separate computation under paragraphs (1) to (8) inclusive of subsection (*a*) of Section 702 of the Internal Revenue Code. Without limiting the generality of the foregoing this provision shall apply to any payments made pursuant to Article XXIV and to any payments of interest on general capital contributions, additional interest on limited or general capital contributions, and interest on cash balances in a General Partner's Pledge Account.

(*d*) Each Partner's distributive share of each item of Partnership income, gain, loss, deduction or credit (after excluding all items referred to in subparagraphs (*a*), (*b*) and (*c*) above) shall be the same fraction thereof as such Partner's fraction of the net profits or net losses, as the case may be, under Article VIII or Article IX, respectively. Without limiting the generality of the foregoing, this provision shall apply to each item of short-term capital gains and losses, long-term capital gains and losses, gains and losses from property used in the trade or business, charitable contributions, dividends from domestic corporations, taxes paid to foreign countries, partially tax exempt interest, tax exempt interest, and all other items of taxable or non-taxable income or loss.