## New Mexico Bancorporation and Subsidiaries, Petitioner v. Commissioner of Internal Revenue, Respondent

Docket No. 5228–78.    Filed September 23, 1980.

*Charles E. Anderson* and *Patricia Tucker*, for the petitioner.
*James R. Turton*, for the respondent.

STERRETT, *Judge:* Respondent determined deficiencies, in a notice dated February 17, 1978, in petitioner's consolidated corporate income taxes for the taxable years 1973, 1974, and 1975 in the amounts of $7,470.63, $16,669.84, and $553.65, respectively. The only issue for our decision is whether petitioner is entitled to claim an interest deduction, pursuant to section 163, I.R.C. 1954, for interest paid with respect to certain repurchase agreements, or whether the interest deduction is prohibited by section 265(2) because the repurchase agreements are considered to be indebtedness incurred or continued to purchase or carry obligations the interest from which is exempt from Federal income taxation.

### FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts together with the exhibits attached thereto are incorporated herein by this reference.

Petitioner New Mexico Bancorporation, Inc. (Bancorporation), is a corporation organized under the laws of the State of New Mexico with its principal place of business in Santa Fe, N.M., at the time of filing the petition herein. Petitioner controlled two subsidiary banks, First National Bank of Santa Fe (First National or bank) and First State Bank of Taos, each of which was engaged in the business of banking. Over 96 percent of the stock of each was held by Bancorporation. Bancorporation engaged in supporting services but did not independently engage in the business of banking. The three corporations timely

filed a consolidated corporate income tax return for each of the years 1973, 1974, and 1975 with the Internal Revenue Service Center at Austin, Tex.

First National was a consumer-oriented bank. Its function was to solicit and accept all varieties of deposits from business and commerical customers and to invest deposits in accordance with various regulatory requirements. As a Federal bank, First National was subject to regulation by the Board of Governors of the Federal Reserve System and the Comptroller of the Currency. The bank was subject to Federal Reserve Regulation D, which related to reserves of member banks, and Regulation Q, which related to interest on deposits.

During the years in issue, as in other years, the noncash assets held by First National consisted mostly of outstanding loans and investment securities. As a general matter, approximately 60 to 70 percent of the bank's assets were invested in loans, and from 20 to 25 percent of its assets were comprised of various forms of securities. Approximately one-half of the securities held by the bank were obligations of the Federal Government, generally with terms of from 1 to 5 years. The other half of the securities investment portfolio consisted of obligations of a State, political subdivisions of a State, or municipal body (municipal bonds), the interest on which is exempt from Federal income tax under section 103, I.R.C. 1954. The State and municipal bonds were held in a 1 to 10 year rolling investment; that is, approximately one-tenth of the bonds matured each year and were routinely replaced with similar obligations upon maturity in order to maintain a constant portfolio investment.

All investment decisions with respect to purchase of securities were reached on the basis of the quality of the security, the maturity date, yield, and the amount of risk, if any. Obligations of the Federal Government, or obligations of other bodies guaranteed by it, presented virtually no risk. Municipal securities issued by the State of New Mexico or subdivisions thereof were considered to be almost as safe as obligations of the Federal Government because of the State law requirement for a balanced budget. First National invested primarily in New Mexico municipal or governmental obligations, all of which were "A" rated or better, or in municipal or political subdivision obligations of other States, payment of which was guaranteed by the Federal Government. As a result, the bank considered its

municipal investments to be as safe as its investments in obligations of the Federal Government.

The presence of Federal, State, and municipal securities, as a substantial part of the investment portfolio of the bank, was necessary to the bank's operation in order to allow it to meet its need for liquidity. First National was required to maintain a liquidity of approximately 20 percent or more of its total assets. Outstanding loans were not considered to be liquid. Accordingly, only cash, unpledged Federal bonds, and State and municipal bonds with maturity dates of 24 months or less were taken into account in determining whether the bank met its liquidity requirements.

In addition, First National held Federal, State, and municipal securities to pledge in connection with certain Government deposits. For example, if Federal funds were deposited with First National, either Federal, State, or municipal securities had to be pledged at par in an amount equal to the deposit. One type of deposit of Federal funds upon which a 100-percent pledge was required was a treasury, tax, and loan account (TT & L account). A TT & L account consisted of deposits from various employers and other individuals which were held in an account controlled for the benefit of the Internal Revenue Service. TT & L accounts were treated in one of two ways as determined by contract. The bank could remit the deposits to the Federal Government on a daily basis or, alternatively, it could enter into a contract with the Federal Government under which the bank retained the funds for a set period of time as a deposit. During such time, the bank had to pay interest to the Government for use of the money and had to pledge obligations of the Federal and State Governments, or municipal bodies in an amount equal to 100 percent of the deposit. In this case, First National remitted funds to the Internal Revenue Service on a weekly basis. The securities used to satisfy the pledge requirement came from the existing securities investment portfolio of the bank. The bank claimed interest expense deductions for all interest paid to the Federal Government on the TT & L accounts without regard to the nature of the security pledged.

Under State law, the State of New Mexico could deposit funds in banks such as First National if certain pledge requirements were met. For instance, New Mexico Statutes sections 11–2–33 and 11–2–34 required that deposits of money from the State,

counties, and municipalities be allocated on a pro rata basis among qualifying banks on the basis of relative capital accounts. In order to qualify to receive public funds, a bank, at the time of deposit of funds, had to be able to meet the legal pledge requirements for acceptance of these deposits. The bank was required to pledge, at par, obligations of the Federal or State Governments, or municipal obligations, equal to 50 percent of the deposits. N.M. Stat. Ann. secs. 11–2–18.1, 11–2–18.2 (1973). No pledges were required for deposits of public funds that were insured by the Federal Deposit Insurance Corp. N.M. Stat. Ann. sec. 11–2–18.1 (1973). In order to satisfy these requirements, First National pledged Federal, State, and municipal securities from its existing securities investment portfolio. First Natonal routinely claimed a tax deduction for the interest paid to the State on deposit of State funds in certificates of deposit in which State and municipal securities were pledged. These deductions have never been disallowed upon audit.

All of the securities in the investment pool of First National were physically held by the Federal Reserve Bank in Denver, Colo. In the event of a deposit with respect to which a pledge of securities from the bank's investment portfolio was required, personnel at First National would notify personnel in Denver as to which previously unpledged securities had been pledged. The actual selection of the security to be pledged with respect to a particular deposit was made by an assistant cashier of the bank as a ministerial function. Whether or not a particular security would be selected was based upon the period of maturity and value of the security. For instance, only securities that were to mature beyond the term of the deposit and had a value in excess of the required reserve amount would be used as pledges. Within those restrictions, any valid unpledged security was available for use, and there was no subjective selection decision to be made. The main concern simply was not to pledge any particular security to two deposits at any given time.

The records of pledged and unpledged securities held by the Federal Reserve were kept by the assistant cashier or a similar ranking employee through the use of safekeeping receipts or similar ledger slips. On a monthly basis, the president of the bank received a breakdown of the securities investment portfolio divided into pledged and unpledged securities for routine reporting to the board of directors. Therefore, the president and

board of directors of the bank did not receive notice of, or participate in, the task of selecting particular securities to satisfy a pledge requirement for any particular transaction. They clearly were aware, however, that tax-exempt bonds were being selected and used as part of the collateral by First National to secure repurchase agreements.

First National, as a consumer-oriented bank, offered its customers four basic types of depository arrangements during the period in question. These included: (1) Demand deposits, (2) passbook savings accounts, (3) time deposits, and (4) repurchase agreements. All types of deposits were actively pursued, and none was encouraged more actively than any other. With respect to demand deposits such as checking accounts, the bank was required to comply with the requirements of the Federal Reserve Board with respect to the adequacy of the bank's reserve account. Customers could not receive interest on demand deposits. Deposits made to passbook savings accounts could earn interest at rates of up to approximately 5 percent during the years in issue and were also subject to the same reserve requirements as demand deposits.

The reserve and interest requirements for time deposits, such as certificates of deposit, were somewhat more complex. Again, the reserve requirements had to be satisfied, but considerably more flexibility was allowed in interest rates. On certificates of deposit of less than $100,000 with terms of from 30 days to 6 years, varying interest rates from approximately $5\frac{1}{2}$ to $6\frac{1}{2}$ percent were allowed during the years in issue. On certificates of deposits of over $100,000, the interest rate was negotiated between the customer and the bank.

The fourth source of deposits for First National during the years in issue was money received pursuant to repurchase agreements between the bank and its customers. Repurchase agreements were deposits received in the ordinary and normal course of the banking business under the terms of which certain Federal, State, or municipal obligations, held as investments by the bank, would be transferred hypothetically to a given purchaser. The transfer would be subject to the bank's written agreement to repurchase the securities at the end of a short period at the original transfer price plus stated interest. Repurchase agreements were generally short-term deposits exempt from normal interest and reserve requirements. The

interest rate was negotiable. Repurchase agreements, in which Government obligations or municipal obligations guaranteed by the Federal Government were used, were free from reserve requirements; repurchase agreements backed by obligations of a State government or subdivision of a State government or municipality, payment of which was not guaranteed by the Federal Government, were subject to reserve requirements.

In 1974, the use of repurchase agreements by First National was reviewed by the Comptroller of the Currency after an inquiry by a bank competitor. As a result of the review, First National's use of repurchase agreements was held to be in exact accordance with all applicable regulations.

In substance, the transaction was treated by the bank and the customer as a secured short-term deposit rather than a sale. Title to the particular securities used to secure the deposit never left the bank, and neither party treated the transaction as a taxable sale. The securities never left the Federal Reserve Bank in Denver.

While the term of a repurchase agreement was generally 28 days, customers could terminate the repurchase agreement at any time prior to the due date and could withdraw all or part of the principal amount of the deposit with no interest penalty for early withdrawal. The withdrawal of deposits in repurchase agreements prior to the stated 28-day term was not an uncommon occurrence during the years in issue. While the customer could terminate at will, the bank could not choose to terminate the repurchase agreement by tendering funds to the customer prior to the maturity date of the repurchase agreement.

The securities used in repurchase agreements by First National during the years 1973 through 1975 were securities held in its general investment portfolio as described above. The same pool of investment securities served as a source of collateral for pledges to the Federal Government with respect to its deposits of TT & L accounts, and for pledges to the State and public bodies within New Mexico on depository transactions for which pledges were required. The specific securities used for repurchase agreements were selected in the same random manner by the same lower echelon employees of the bank. There was no difference between the source, selection, or use of pledged collateral for a repurchase agreement, for certificates of deposit

involving State and municipal or public bodies funds, or for Federal fund deposits in TT & L accounts.

Repurchase agreements were used by the bank to meet the demand by a certain group of its customers for the particular characteristics of the repurchase agreement. The customers to whom repurchase agreements generally appealed were public bodies, State bodies, and individuals with large amounts of funds, generally over $100,000, to deposit. The two main advantages of repurchase agreements to the depositor were the liquidity provided and the interest rate available. Because of the ability to withdraw deposited funds before the expiration of the stated term of the agreement without prepayment penalties, the customer had the convenience of the liquidity of demand deposits and passbook savings accounts. Although the rate of interest on certificates of deposit was generally higher than that on repurchase agreements, the latter competed with commercial paper, short-term treasury bills, and certificates of deposit as alternative investments for the depositor. The advantages of repurchase agreements over other alternatives were the elimination of the market risk of commercial paper and the increased liquidity over certificates of deposit.

Bank customers were insured up to certain limits by the Federal Deposit Insurance Corp. on demand deposits, passbook savings accounts, and time deposits. Individuals could receive insurance on deposits of up to $40,000 and other investors could receive insurance in amounts of up to $100,000 on these types of deposits. Repurchase agreements, however, were not insured but were pledged with bonds as collateral.

Repurchase agreements entered into by First National and its customers during the years in issue were secured predominantly by Federal securities. Approximately 5 to 15 percent of the total repurchase agreements in effect in those years involved the use of obligations of the State, subdivision, or other municipalities, the interest on which was exempt from Federal income tax under section 103. In some cases, both Federal and municipal bonds were used.

In early 1975, First National discontinued its use of municipal obligations in repurchase agreements, although it continued its use of repurchase agreements using other securities from its general investment portfolio. The bank's reasons for discontinuing the use of municipal obligations in repurchase agreements

were twofold. First, the bank wanted to avoid Federal Reserve Bank regulations. Repurchase agreements using securities of the Federal Government or municipal securities, the payment of which was guaranteed by the Federal Government such as the project housing notes, were not subject to the Federal Reserve Board's reserve requirements. Sec. 304.1(f), Federal Reserve System, Regulation D. Use of municipal securities made the repurchase agreements subject to such reserve requirements, thereby increasing the amount of the reserves needed to be maintained with respect to the bank's overall deposits. Second, additional clerical and accounting burdens were required in order to compute the weekly reserve requirements of the bank's new deposits. By the end of 1974, the bank had a sufficient amount of obligations of the Federal Government and obligations guaranteed by the Federal Government to meet all demands for repurchase agreements. In addition, the bank had sufficient demand for the use of municipal obligations as pledges on certificates of deposit or other deposits of State funds subject to pledging requirements. It could meet customer demand for repurchase agreements with Federal or federally guaranteed obligations so as to avoid any reserve requirements.

Financial statements of First National for the years 1972 through 1975 demonstrate that the bank's investment in obligations of State and political subdivisions increased each year notwithstanding the bank's discontinuance of the use of such obligations for repurchase agreements in late 1974. Similarly, the bank's investment in both Federal Government obligations and obligations of State and political subdivisions continued to increase in proportion to the increase in total assets of the bank. The following chart sets forth the comparative amount of Federal Government obligations, obligations of State and political subdivisions, total assets, and repurchase agreements as of the end of each of the years 1972 through 1975:

|  | U.S. Government obligations | Obligations of State and political subdivisions | Total assets | Repurchase agreements |
|---|---|---|---|---|
| 1972 | $9,594,267 | $7,819,574 | $69,032,646 | $954,500 |
| 1973 | 10,184,474 | 8,165,252 | 75,325,822 | 6,929,000 |
| 1974 | 8,780,297 | 9,483,550 | 80,542,350 | 4,905,000 |
| 1975 | 14,273,250 | 11,454,166 | 95,340,515 | 4,828,500 |

The funds obtained from repurchase agreements during the years in issue were not used directly to purchase municipal

securities. The deposits generated by repurchase agreements were generally invested in the Federal funds market by First National.

On occasion, customers of First National, who had made use of the repurchase agreement form of deposit, entered into new repurchase agreements upon the expiration of the original agreement. The new agreements might contain the same or different security, and the same or different interest rates, depending upon the prevailing condition of the economy. Public body customers, such as the New Mexico Board of Education, often rolled over such accounts, with decreasing balances, due to their need to use previously deposited funds. Other customers occasionally made use of the redeposit ability.

On a year-to-year basis, Bancorporation, the parent of First National, did not have substantial amounts of cash available for deposits in any form with any depository. However, in the period 1973 to 1975, Bancorporation had received from $500,000 to $600,000 as a result of a public offering of its stock. Of the various types of deposits available, Bancorporation chose to put its money into repurchase agreements with First National. Some of these agreements are in issue here. The use of repurchase agreements by Bancorporation was at its own initiative, and not at the initiative of First National.

Bancorporation selected the repurchase agreements because it sought the same flexibility as that sought by public body depositors, i.e., a relatively high interest rate with a short-term, secure investment. Certificates of deposit were not acceptable because of the restrictions upon early withdrawal. There was no substantive difference in any respect between the repurchase agreements transacted between First National and Bancorporation and those transacted between First National and other depositors.

The interest paid and deducted by First National, with respect to those repurchase agreements with Bancorporation that were backed by municipal securities, was reportable as interest income by Bancorporation for each of the years 1973 and 1974. This interest income was included on the consolidated Federal income tax returns of New Mexico Bancorporation, Inc., and its subsidiaries for 1973 and 1974 as interest received in the amounts of $8,723.33 and $8,516.45, respectively. First National did not include in income on its 1973, 1974, or 1975 returns the tax-exempt interest received on its tax-exempt securities.

First National claimed deductions for interest paid with respect to repurchase agreements, which included the use of municipal securities, in the amounts of $15,564.65, $34,728.53, and $1,154.07 for the taxable years 1973, 1974, and 1975, respectively. On audit, respondent disallowed the interest expense deduction on the ground that the interest had been paid on repurchase agreements that used municipal securities as collateral.

## OPINION

The sole issue for our consideration is whether petitioner may deduct interest expenses incurred in 1973, 1974, and 1975 with respect to repurchase agreements that were backed by municipal obligations. Section 163(a) allows a deduction for all interest paid or accrued on indebtedness within a taxable year. Section 265(2), however, disallows such interest deduction for interest paid "on indebtedness incurred or continued to purchase or carry obligations the interest on which is wholly exempt from * * * taxes."[1]

Respondent claims that the interest payments made by petitioner during the years in issue are not deductible under section 265(2) because the interest was paid on indebtedness incurred or continued in order to purchase or carry tax-exempt municipal securities. Petitioner, on the other hand, asserts that repurchase agreements, using obligations of States and political subdivisions, do not constitute indebtedness of the type contemplated in section 265(2). Further, "indebtedness," represented by deposits in banks, is not the type of indebtedness that is incurred or continued to purchase or carry tax-exempt obligations. Hence, section 265(2) should not apply, and interest paid on the repurchase agreements should be deductible under section 163(a).

We note at the outset that only 5 to 15 percent of all repurchase agreements entered into during the years in issue

---

[1] Sec. 1.265–2(a), Income Tax Regs., provides in pertinent part:

"No amount shall be allowed as a deduction for interest on any indebtedness incurred or continued to purchase or carry obligations, the interest on which is wholly exempt from tax under subtitle A of the Code, such as municipal bonds, Panama Canal loan 3-percent bonds, or obligations of the United States, the interest on which is wholly exempt from tax under subtitle A, and which were issued after September 24, 1917, and not originally subscribed for by the taxpayer. * * * "

were backed by tax-exempt State or municipal securities. The majority of repurchase agreements was backed by Federal obligations or obligations guaranteed by the Federal Government. Repurchase agreements involving such Federal securities were not considered deposits by the Board of Governors of the Federal Reserve System and were therefore not subject to interest and reserve restrictions. Federal Reserve System Regulations D and Q. Such repurchase agreements are not in issue here. We are concerned only with the repurchase agreements that were backed by tax-exempt securities, for such repurchase agreements are routinely treated as deposits by the Federal Reserve and are subject to applicable restrictions. Further, we note that repurchase agreements backed by municipal obligations were one of four ordinary forms of bank deposit with its own unique appeal to particular depositors.

On a number of occasions, respondent himself has expressly conceded that bank deposits are not the type of indebtedness to which section 265(2) was intended to apply. For example, in Rev. Rul. 61–222, 1961–2 C.B. 58, respondent stated that "The provisions of section 265(2) * * * have no application to interest paid on indebtedness represented by deposits in banks engaged in the general banking business since such indebtedness is not considered to be 'indebtedness incurred or continued to purchase or carry obligations * * * ' within the meaning of section 265." Respondent has conceded that repurchase agreements constitute ordinary depository bank transactions and are not the type of indebtedness described in section 265(2). Rev. Proc. 70–20, sec. 3.04.[2] Thus, it is incorrect to characterize ordinary bank deposits, such as repurchase agreements, as loans as urged by respondent. However, even if bank deposits such as repurchase agreements are considered to be indebtedness entered into between a debtor (the bank) and a creditor (the depositor), where the form of indebtedness is an ordinary and customary depository transaction, section 265(2) will not be applied.

Section 265(2) does not apply unless the facts reveal that the purpose of incurring or continuing indebtedness is to purchase or

---

[2] We have reviewed the legislative history of sec. 265(2) (and its predecessor, sec. 23(b), I.R.C. 1939) and have found that respondent's position in his revenue ruling and revenue procedure is consistent with the intent of Congress. H. Rept. 704, 73d Cong., 2d Sess. 21–22 (1934). See also *Investors Diversified Services, Inc. v. United States*, 575 F.2d 843, 848 (Ct. Cl. 1978); *Leslie v. Commissioner*, 413 F.2d 636, 638 (2d Cir. 1969).

carry tax-exempt securities. *Phipps v. United States,* 188 Ct. Cl. 531, 414 F.2d 1366, 1372 (1969); *Bishop v. Commissioner,* 41 T.C. 154, 160 (1963), affd. 342 F.2d 757 (6th Cir. 1965). Such prohibited purpose must be established by the showing of a sufficiently direct relationship between the indebtedness and the exempt securities. *Illinois Terminal R.R. Co. v. United States,* 179 Ct. Cl. 674, 375 F.2d 1016, 1020–1021 (1967). Evidence that indebtedness was incurred at the same time that tax-exempt securities were held is not enough to establish the requisite prohibited purpose. A more direct nexus must be shown. For example, section 265(2) should not be applied to disallow an interest deduction where indebtedness is incurred for substantial business reasons independent of the purposes for which exempt obligations are held. Cf. *Wisconsin Cheeseman, Inc. v. United States,* 388 F.2d 420, 423 (7th Cir. 1968). "In a word, where the issue is disputed there should always be an inquiry, more-or-less particularized, into the connection and relationship between the tax-exempts and the indebtedness so as to discover whether in fact the taxpayer used borrowed funds for the primary purpose of purchasing or carrying those securities." *Investors Diversified Services, Inc. v. United States,* 216 Ct.Cl. 192, 575 F.2d 843, 848 (1978).

In the instant case, First National Bank did not incur indebtedness for the prohibited purpose of purchasing tax-exempt obligations. There is no evidence that the bank accepted the deposit of funds as repurchase agreements and then directly used such funds to purchase State and municipal securities. See, e.g., *Wynn v. United States,* 411 F.2d 614, 615 (3d Cir. 1969) cert. denied 396 U.S. 1008 (1970). In fact, the record shows that deposits generated by repurchase agreements were not used to purchase municipal securities but were invested in the Federal funds market. To use funds acquired through high-interest repurchase agreements to purchase relatively low-interest exempt securities would have been economically imprudent.

Furthermore, in order to find that indebtedness was incurred for the purpose of carrying exempt obligations, we would have to find a direct nexus between the purpose for holding exempt securities and the offering of repurchase agreements. The mere fact that deposits were collateralized by tax-exempt securities does not, by itself, establish the required direct relationship between the incurrence or continuance of indebtedness and the carrying of such securities. Respondent relies on *Wisconsin*

*Cheeseman, Inc. v. United States, supra,* for the proposition that the use of tax-exempt securities as collateral ipso facto establishes the required direct relationship.

In *Wisconsin Cheeseman, Inc.,* the Seventh Circuit applied section 265(2) to deny an interest deduction to a corporation that took out short-term bank loans to meet recurrent seasonal needs for funds and pledged exempt securities as collateral. The court found that municipal obligations were acquired with receipts from peak business periods and were intended to be used as collateral to meet off-season needs for funds. Therefore, there was no independent business purpose for the acquisition or retention of municipal obligations except for use as collateral.

While the use of exempt securities as collateral is a relevant factor, it does not automatically compel application of section 265(2). Courts, including the Seventh Circuit Court of Appeals in *Wisconsin Cheeseman, Inc.,* historically look to all of the facts and circumstances to see whether there is a "sufficiently direct relationship between the debt and the carrying of the tax-exempt bonds." *Wisconsin Cheeseman, Inc. v. United States, supra* at 423. See also *Investors Diversified Services, Inc. v. United States, supra* at 848, 853; *McDonough v. Commissioner,* 577 F.2d 234, 235 (4th Cir. 1978), affg. a Memorandum Opinion of this Court.

In this case, the bank's purpose for offering repurchase agreements as a regular form of deposit was independent of its purpose for acquiring tax-exempt securities. The years 1973 and 1974 were times of rising interest rates. Large depositors were attracted by the possibility of high yields and the low risk of investments outside the bank, such as Government securities. In an attempt to stem the trend of withdrawals of large deposits and to remain competitive in the industry, First National began to offer repurchase agreements. Repurchase agreements were attractive to large depositors because they offered a relatively high yield, short-term, and secure investment. Furthermore, the offering of repurchase agreements was agreeable to the bank because repurchase agreements were not subject to the same strict Federal Reserve regulations as demand deposits, passbook savings accounts, or certificates of deposit. For example, interest rates on repurchase agreements were negotiable. Only repurchase agreements backed by State or municipal bonds were subject to reserve restrictions, while repurchase agreements

backed by direct obligations of the Federal Government or obligations guaranteed indirectly by the Federal Government were exempt therefrom. Thus, the purpose of offering repurchase agreements was to meet the needs of depositors and to keep large depositors from moving their funds to investments outside the bank. Furthermore, the facts in this case establish that repurchase agreements would have been used by the bank regardless of whether tax-exempt securities were used as collateral.

The particular securities used as collateral for a repurchase agreement were chosen from the grab bag of securities held in the bank's investment portfolio. An assistant cashier of the bank made the selection of the securities to be pledged as a routine ministerial function. The only requirements for selection were that the securities not be previously pledged, that they have a value in excess of the amount of the deposit, and that they have maturity dates beyond the term of the deposit. The particular security chosen was not a matter of negotiation between the depositor and the bank. While the bank may have preferred to use Federal obligations in order to avoid reserve and interest restrictions, the facts indicate that the choice of security was not a factor in determining whether depositors put their money into repurchase agreements or some other form of deposit.

On the other hand, First National had independent business reasons for purchasing and maintaining State, municipal, and political subdivision tax-exempt bonds in its securities portfolio. First, the bank was required to keep liquid approximately 20 percent of its assets in order to meet the demands of its depositors. Along with cash and unpledged Federal Government bonds, unpledged municipal bonds with maturity dates of 24 months or less could be taken into account to satisfy these liquidity requirements. Second, as a condition to accept State and Federal Government deposits, the bank was required to satisfy certain pledging requirements. For example, in order to act as a depository for Federal TT & L account funds, the bank was required to pledge Federal, State, or municipal securities at par in an amount equal to 100 percent of the deposit. To accept State of New Mexico general fund moneys, a pledge of 100 percent of the deposit was required; State severence tax funds and public body (such as State board of education) funds required only a 50-percent pledge.

It is clear from an analysis of the pledge requirements on the various forms of deposit that First National offered repurchase agreements because of the customer demand for its characteristics. For example, from the bank's point of view, it would have been more advantageous to have State funds, which were subject only to a 50-percent pledge requirement, in certificates of deposit rather than in 100-percent pledged repurchase agreements because the bank would then have additional liquidity with respect to the unpledged securities. Similarly, if wealthy individual depositors put their money in forms of deposit other than repurchase agreements which were subject to less onerous reserve restrictions, the bank could avoid the necessity of pledging securities at 100 percent of par, and it could improve its liquidity position.

In addition, the record indicates that State and municipal obligations would have been, and in fact were, held in the bank's investment portfolio for reasons totally independent of the use of the obligations in repurchase agreements. This is evidenced by the fact that there was no mathematical correlation between the acquisition and retention of obligations of State Governments and political subdivisions and the use of such securities in repurchase agreements. In fact, after 1973, the demand for repurchase agreements declined while holdings of State and political subdivision obligations increased. Therefore, First National would not have purchased municipal obligations in order to meet declining customer demand for repurchase agreements in 1973 through 1975, nor would they have purchased municipal obligations in anticipation of a demand for repurchase agreements. In any event, such a purchase would not have been economically prudent because of the wide spread between the relatively low interest rates available on municipal securities and the higher interest rates paid on repurchase agreements.

Thus, in order to maintain adequate liquidity and to attract deposits of Government funds for which securities were required to be pledged, it was necessary for the bank to maintain a standing investment portfolio of Federal, State, and municipal obligations. The purchase of State and municipal bonds, the interest from which is exempt from Federal income tax under section 103, was not tied to any particular form of deposit, but was made as part of the overall investment policy and practice of the bank to satisfy its liquidity and pledge requirements. As

there was no direct relationship between the acceptance of deposits under repurchase agreements and the acquisition or carrying of exempt securities, section 265(2) does not apply to disallow a deduction for interest paid on repurchase agreements that were backed by State and municipal obligations. Furthermore, the bank president testified that municipal obligations were used during those years only because they were already within the bank's regular investment portfolio and were, from time to time, in excess of the bank's liquidity and other pledge needs.

Based upon all the facts, we conclude that repurchase agreements, using State or municipal obligations, were similar to other types of bank deposits and were not the types of loans or indebtedness intended to be covered by section 265(2). Furthermore, the bank's purpose for offering repurchase agreements was independent and not sufficiently related to the holding of tax-exempt State and municipal obligations to invoke section 265(2). We therefore find that the interest paid on repurchase agreements that were backed by tax-exempt securities is deductible under section 163(a). Because we see no reason to treat the repurchase agreements with Bancorporation any differently from repurchase agreements purchased by outside depositors, we find that interest paid to the parent company was properly deducted by First National.

*Decision will be entered for the petitioner.*