RALPH EMERSON LANG, JR., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Lang v. Commissioner
Docket No. 28956-81
United States Tax Court
T.C. Memo 1983-318; 1983 Tax Ct. Memo LEXIS 473; 46 T.C.M. (CCH) 335; T.C.M. (RIA) 83318; June 6, 1983. Robert O. Rogers and Jerald D. August, for the petitioner. W. Robert Abramitis, for the respondent. SHIELDS
MEMORANDUM FINDINGS OF FACT AND OPINION SHIELDS, Judge: Respondent determined a deficiency in petitioner's 1980 income tax of $616,765.81, and additions to tax of $62,401.03 under section 6651(a)(1), [1] of $31,200.52 under section 6653(a), and of $39,799.89 under section 6654. [2] Due to concessions by both parties, the issues remaining for our decision are: (1) whether the petitioner had a $304,000 cost of goods sold and a $4,500 cost of selling certain municipal bonds; (2) whether petitioner had additional income in the amount of $250,212.50 due to the sale of other municipal bonds; (3) whether petitioner *475 had a long term capital loss carryover from 1977 of $125,000 from Fudpucker's, Inc.; (4) whether petitioner is entitled to deduct interest and real estate taxes paid in connection with a residence used by petitioner, but titled in the name of Federal Builders, Inc.; (5) whether petitioner is entitled to deduct interest paid on borrowings against municipal bonds held by him in certain brokerage accounts; (6) whether petitioner received additional income from the diversion of funds from Luxury Builders, Inc.; and (7) whether petitioner is liable for the addition to tax under section 6653(a). FINDINGS OF FACT Petitioner, Ralph Emerson Lang, Jr., resided in Florida when he filed his petition herein. He filed his individual income tax return for 1980 on August 7, 1981. His return was due on June 15, 1981. For his 1977, 1978 and 1979 taxable years, petitioner filed a joint income tax return with his then spouse, *476 Susan M. Lang. 1. Bond Transactions
Petitioner knew Vincent Albano (Albano). Around June 30, 1980, Albano contacted petitioner and told him that a Leonard Lorin (Lorin) had some municipal bonds available for purchase at a discounted price. Petitioner was generally familiar with municipal bonds and held such bonds for investment purposes in brokerage accounts with Paine Webber Jackson & Curtis, Inc. (Paine Webber) and with Merrill Lynch Pierce Fenner & Smith (Merrill Lynch). Petitioner was informed that Lorin was an attorney and was selling the bonds on behalf of a client. Petitioner was interested in purchasing some of the bonds from Lorin, and went to Lorin's office in New York, accompanied by Albano. There Lorin showed him three Bond Anticipation Notes, Nos. 128, 129, and 130, issued by Onondaga County, New York (the Onondagas) in the face amount of $25,000 each. The Onondagas were due for maturity on July 3, 1980. Lorin also showed petitioner a Municipal Assistance Corporation (MAC) bond, No. 1468, issued for the City of New York (popularly known as a "Big MAC" bond) in the face amount of $100,000. Because six MAC bonds with different serial numbers are involved *477 in this case, we will hereinafter refer to this bond as Bond No. 1. After meeting with Lorin, petitioner was concerned that the bonds were forged. He called his broker in Miami and gave him a complete description of the bonds so that his broker could verify them.The broker checked with the National Crime Commission, and then advised petitioner that the bonds were "OK." In fact, the bonds had been stolen from the custody of Shearson American Express. Shearson discovered that the Onondagas were missing on June 19, 1980, and that $600,000 in face value of MAC bonds were missing in May 1980. It subsequently discovered that an additional $400,000 in face value of MAC bonds were missing. These included all of the bonds involved in this proceeding, including those which will be discussed subsequently as Bonds Nos. 2 through 6. On June 19, 1980, Shearson reported to the transfer agent, Citibank, that the Onondagas were missing. However, their absence was not reported to the Federal Bureau of Investigation or the Securities and Exchange Commission. Moreover, Shearson did not report that the MAC bonds were missing to the FBI or the SEC until January 6, 1981. The FBI maintains a *478 list of stolen securities reported to it, which is made available for verification. Petitioner took Bond No. 1 and the Onondagas from Lorin after being advised by his broker that they were all right. He delivered No. 1 to the Singer Island National Bank (Singer Bank), [3] in Florida, with instructions that it be sold and the proceeds deposited to his account. He delivered the Onondagas to a branch of Singer Bank with the request that they be forwarded for collection. On July 11, 1980, proceeds from the sale of Bond No. 1, in the amount of $89,416.67, were deposited in petitioner's account at Singer Bank. On the same day, petitioner withdrew $80,000 from his account in the form of ten cashier's checks. Each check was written for an amount of less than $10,000 to avoid the cash-transaction-reporting requirements of the Internal Revenue Service. On or about July 11, 1980, petitioner cashed $40,000 worth of the cashier's checks. He then met Lorin in front of the Singer Bank and gave Lorin the cash in part payment for Bond No. 1. Next, *479 he endorsed the remaining cashier's checks and gave them to Albano's brother as a loan.Lorin agreed to accept delayed payment in full for Bond No. 1 because of petitioner's $40,000 loan to Albano's brother. On July 31, 1980, petitioner withdrew $38,600 against his Merrill Lynch account in the form of four checks in amounts of less than $10,000. He cashed these checks and delivered them to Lorin in complete payment of No. 1. On July 29, 1980, the $75,000 principal amount of the Onondagas was credited to petitioner's account by Singer Bank. Interest on the bonds in the amount of $4,045.99 was credited to petitioner's account on August 8, 1980. Between July 30 and August 1, 1980, petitioner withdrew $76,400 in checks from his Singer Bank account. All of the checks were for amounts of less than $10,000. He cashed some of these checks, and converted others into cashier's checks before cashing them. Petitioner then delivered the cash proceeds to Lorin, outside of Singer Bank, in full payment for the Onondagas. Petitioner later asked Albano about purchasing two additional MAC bonds from Lorin to hold as part of his investment portfolio. Albano contacted Lorin, who agreed to *480 sell petitioner MAC bonds Nos. 1481 and 1483, in face amount of $100,000 each, for $149,000. For convenience, these bonds will be referred to as Bonds Nos. 2 and 3. Before accepting Bonds Nos. 2 and 3, petitioner had his broker check with the National Crime Commission to verify that they were valid obligations. He was advised that they were. However, Nos. 2 and 3, like the Onondagas and No. 1, were bonds stolen from the custody of Shearson. Petitioner agreed to pay Lorin for Bonds Nos. 2 and 3 as soon as he could obtain cash for their purchase. He then borrowed $149,000 against his brokerage accounts with Merrill Lynch and Paine Webber. As in petitioner's prior bond purchases, he obtained cash which he delivered to Lorin in front of Singer Bank. Sometime after petitioner purchased Nos. 2 and 3, Lorin called him to advise him that the client for whom Lorin had sold the bonds was having marital troubles. Lorin told petitioner that if the client's wife found out that the bonds had been disposed of, petitioner could have some problem due to his purchase. [4]
Because of the possible *481 problem petitioner decided to dispose of the bonds in the Bahamas, using an alias, so that he could keep his name from the bonds. He opened an account in the Bahamas with Portfolio Management Services, Ltd. (PMS) in the name of Bill Roberts. PMS instructed petitioner to deposit the bonds with Goldman Sachs & Co. in New York, for the account of PMS, and to advise PMS when this was done. PMS informed petitioner that upon being advised of the deposit it would sell the bonds and would transfer the proceeds therefrom pursuant to petitioner's instructions.
Petitioner took the bonds to Lorin's office in New York on September 26, 1980. He and Lorin went to Goldman Sachs, where Lorin delivered Bonds Nos. 2 and 3 and obtained a receipt for their delivery for the account of PMS. The bonds were sold and the proceeds, totaling $161,041.67, were credited to PMS. On petitioner's instructions, PMS then transferred $156,541.67 to the account of First Miami Securities. The $4,500 difference between the sale proceeds and the amount transferred represented a handling charge by PMS for the use of its services. The transferred amount was used by First Miami Securities to purchase other MAC bonds *482 for an account in the name of Howard Emery. However, these bonds were delivered to petitioner and were his property. Lorin also sold MAC bonds, numbers 1484, 1485 and 1477 (hereinafter referred to as Bonds Nos. 4 through 6), to purchasers other than petitioner. He later advised these purchasers, as he had advised petitioner, that they might have some difficulty with the bonds due to his client's marital problems. Again to avoid such problems Lorin asked petitioner if these purchasers could make use of his PMS account and petitioner agreed. Bonds Nos. 4 through 6 were delivered to Goldman Sachs for the account of PMS. Eventually, the proceeds of Nos. 4 through 6 (less $3,025 which was retained by the petitioner for the use of his PMS account) were credited to the account of First Miami Securities, as the proceeds from Bonds Nos. 2 and 3 had been. Using these funds, First Miami Securities then purchased Tri-Borough Bridge and Tunnel Authority bonds, for an account in the name of Hyman Kaplan. Kaplan is an attorney who shared an office with Lorin. These bonds were then mailed to Kaplan at his New York address. 2. Loss from Fudpucker's, Inc.
In 1976, petitioner purchased *483 all of the stock of Fudpucker's, Inc., a corporation which operated a restaurant and lounge in West Palm Beach, Florida, for $119,900. He then contributed cash of $886.50 to the company's cash registers for use as change on the first night of operation under the new ownership. He also paid $1,000 down on a grand piano for use in the lounge. Later in 1976, he loaned the company $9,000 for its operations. In 1977, he paid $2,953.50 and $1,202.03 from his personal account on indebtedness owed by the company. Fudpucker's was not a profitable investment. Petitioner closed its doors during April, 1977. At that time, the corporation instituted a dissolution suit in the state court naming the petitioner and its other creditors as parties. The court appointed a receiver to liquidate the corporation and wind up its affairs. Final judgment was rendered on June 27, 1978 by the state court which approved the sale of the corporate assets and discharged the receiver. Petitioner did not recover anything from the liquidation. During 1978 and 1979, petitioner failed to report certain long term capital gains he received on various sales. He believed that these gains were more than offset *484 by a long term capital loss carryover from the failure of Fudpucker's. In 1978, he had a gain of $15,700 from the sale of a lot, and received $32,500 in partial payment of an installment obligation, of which 98.34 percent, or $31,960.50, was taxable gain. In 1979, he had a gain of $7,152.75 from the sale of New Jersey Sports Exposition Authority bonds. Petitioner did not report these gains on his 1978 and 1979 returns. He also did not claim any carryover on these returns for the 1977 loss from Fudpucker's stock. 3. Expenses Related to Petitioner's Residence
Prior to 1980, petitioner formed a corporation, Luxury Home Builders (Luxury), to build homes. He also organized a corporation, Federal Builders of Florida (Federal), to develop land and sell homes constructed by Luxury. The petitioner has always been the sole stockholder and principal officer of both corporations. Prior to 1967 Federal purchased a lot at 879 Country Club Drive on which Luxury constructed a residence. Petitioner paid Federal for the residence, and has lived in it since about 1967.Since that time he has paid all taxes and expenses associated with the residence. However, he has never caused Federal *485 to convey title in the property to him. Sometime between December 1, 1980 and January 12, 1981, petitioner paid real estate taxes on the residence in the amount of $1,713.08. The receipt from the county tax assessor shows that the amount paid was attributable to taxes due in December 1980. The receipt also indicates that the $1,713.08 was paid on January 12, 1981. Petitioner testified that he never paid his taxes late and probably mailed his check on the last day of 1980. There is no other evidence as to when petitioner mailed in his payment. During 1980 petitioner borrowed money for a construction project. He caused Federal to place a mortgage on the residence as collateral for the loan. He personally received the proceeds of the loan, and has subsequently paid the interest due on it. During 1980, he paid interest in the amount of $2,662.11 on the loan. The record does not contain a copy of the note or any direct evidence as to whether it is in the name of the petitioner or the name of Federal. The petitioner's testimony is to the effect that both the residence and the loan are his and have always been so treated by him and by Federal. Respondent offered no evidence *486 to the contrary. 4. Interest on Borrowings Against Municipal Bonds
During 1980, petitioner paid interest in the amounts of $1,331 and $16,239.08 to Merrill Lynch and Paine Webber, respectively. The interest was due on the loans made to petitioner by these brokerage firms. The loans were collateralized by tax-exempt municipal bonds held in petitioner's accounts with each respective brokerage firm. Petitioner borrowed monies against his account at Merrill Lynch to pay for some of the municipal bonds which he purchased from Lorin. He also borrowed on this account to make a $40,000 loan to Albano's brother. Petitioner borrowed monies against his Paine Webber account for a variety of purposes.At the beginning of 1980, his outstanding loan on that account was $73,941.16. Part of this amount was attributable to petitioner's 1976 borrowing of $100,000 to buy stock in Fudpucker's, Inc. Part was attributable to petitioner's 1977 withdrawal of $77,500 to purchase a personal boat. Part was attributable to other, smaller borrowings. Part was attributable to the purchase of other municipal bonds. It was impossible to allocate the outstanding 1980 balance to a particular loan. *487 During the course of 1980, petitioner borrowed an additional $101,068.75 against his account to purchase Bonds Nos. 2 and 3. When these bonds were sold, he reinvested the proceeds in other municipal bonds. 5. Diversion of Income from Luxury
During 1975, Luxury adopted a plan of complete liquidation pursuant to section 337. At that time, Luxury owned an undeveloped corner lot, in addition to its other assets. In the process of distributing its assets within twelve months, as required by section 337, Luxury conveyed the lot to petitioner's son as trustee, apparently for the petitioner. However, due to a scrivener's error, the deed incorrectly described the lot. When petitioner later attempted to sell the lot in 1978, he was unable to do so because of the erroneous description in the deed. Petitioner's attorney advised him that Luxury would have to be reactivated in order to cure the title defect and convey the lot. Petitioner did so, and Luxury conveyed good title to the purchaser. However, upon the lot's subsequent sale, the note and mortgage were issued by the buyer to petitioner, as trustee. [5]
*488 OPINION 1.Bond Transactions
a. Evidentiary Issue
Petitioner, Albano, and Lorin were indicted in 1980 for interstate transportation of stolen securities. The case against petitioner was dismissed by the trial judge in 1981. While the indictment was still outstanding against all three they met, along with their attorneys, to discuss the case. At that meeting, Lorin made certain statements which petitioner seeks to introduce as evidence in the present case. Petitioner contends that Lorin's statements at the meeting are admissible under Rule 804 of the Federal Rules of Evidence. In particular, petitioner asserts that the statements are admissible because when made they were against Lorin's penal and proprietary interests. Petitioner observes that, because Lorin was excused from testifying in the present case to protect his Fifth Amendment privilege against self-incrimination, he is, in effect, unavailable as a witness. Thus, petitioner asserts that Lorin's declarations at the meeting are admissible under the statement-against-interest exception to the hearsay rule. Rule 804, F.R.E. We agree.
*489 The relevant portions of Rule 804, F.R.E., provide as follows: (a) Definition of unavailability. "Unavail-ability as a witness" includes situations in which the declarant-- (1) is exempted by ruling of the court on the ground of privilege from testifying concerning the subject matter of his statement * * *. (b) Hearsay exceptions. The following are not excluded by the hearsay rule if the declarant is unavailable as a witness: * * * (3) Statement against interest. A statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject him to civil or criminal liability, or to render invalid a claim by him against another, that a reasonable man in his position would not have made the statement unless he believed it to be true. Lorin was clearly unavailable to testify under Rule 804(a), F.R.E., because he had been exempted from doing so on the grounds of privilege by a ruling of this Court. Thus, the pivotal issue in our inquiry is whether the statements he made were against his interest.We must accordingly examine the statements for purposes of determining their admissibility. At the meeting, *490 Lorin was asked if he had received any money from petitioner for the bonds.This question ws posed both by Lorin's attorney and by petitioner's attorney in the criminal case. In response, Lorin stated that petitioner had paid him for the bonds, and that the payment was in cash. Lorin's statements were against his penal and his proprietary interests. First, Lorin's acquiescence that he knew of the bonds and was in possession of them at the time when they were stolen had criminal implications contrary to Lorin's penal interests. Second, acknowledgment of the receipt of money in payment of a debt is generally recognized to be a statement against the declarant's pecuniary or proprietary interests. McCormick, Handbook of the Law of Evidence 671 (2d ed. 1972); Wigmore, 5 Evidence secs. 1460-65 (Rev. ed. 1974). Not only would the fact of payment preclude Lorin from claiming that the bonds had been stolen from him, but it would also preclude him from asserting a claim for payment against petitioner on behalf of himself or his client. Furthermore, such a declaration of payment might subject him to income tax liability. Respondent does not dispute that Lorin made the statement. Instead, *491 he insists that the statement was not against Lorin's interest when made, and thus is not admissible as an exception to the hearsay rule. Respondent focuses on an additional statement made by Lorin at the meeting, to wit: Lorin said that he had received the cash payments on the bonds from petitioner on behalf of a client. Respondent asserts that this accompanying declaration precluded Lorin's acknowledgment of payment from being a statement against his interest. Instead, respondent insists that Lorin's declaration meant only that he was an innocent conduit for his client, and thus his receipt of payment on behalf of his client did not subject him to liability on the stolen bonds. We agree that Lorin's statement about his client may tend to exculpate him from criminal liability. However, it has no bearing on whether he received payment from petitioner for the stolen bonds. The issue before this Court is not whether the bonds were stolen, but whether petitioner had a cost basis in those bonds. Lorin's declaration that he received payment for the bonds on behalf of a client was directly contrary to his proprietary interests, discussed above. Thus, it is irrelevant whether the *492 additional statements made by Lorin were not contrary to his penal interests. In sum, all of the requirements of Rule 804, F.R.E., for admitting Lorin's declaration are satisfied. He was unavailable because he had been excused from testifying under a claim of privilege. His statements were certainly against his proprietary interests, and may be contrary to his penal interests. Under these circumstances, we will admit the testimony as to Lorin's declarations. b. Bonds Nos. 1, 2 and 3 and the Onondagas
Petitioner received a total of $329,503.53 from his sale of MAC Bonds Nos. 1, 2 and 3, and from his presentation of the Onondagas for collection. He asserts that he had a cost basis of $304,000 in the bonds and an expense of $4,500 in securing the proceeds of MAC Bonds Nos. 2 and 3 from PMS. To the contrary, respondent contends that petitioner had no cost basis in the bonds, and no expenses for obtaining the bond proceeds.
Petitioner has the burden of establishing his cost basis in the bonds. Rule 142(a). [6] Petitioner argues that respondent's assessment was arbitrary and thus *493 that respondent has the burden of proof. Respondent contends that petitioner's attempt to shift the burden of proof is a new issue, first raised on brief, and therefore not properly before the Court. However, we do not decide whether the burden of proof has shifted to respondent, or whether a new issue is involved, because we reach the same result regardless of who has the burden of proof. The evidence before us shows that petitioner paid $304,000 to Lorin for the Onondagas and the MAC Bonds Nos. 1, 2 and 3, and $4,500 for obtaining the proceeds of Bonds Nos. 2 and 3. Petitioner's brokerage and bank account records show that after he received credits for Bond No. 1 and the Onondagas, he made large withdrawals from his accounts for amounts slightly less than the proceeds of the bonds. On approximately the same dates that his withdrawals were made, petitioner wrote multiple checks to himself, in denominations of less than $10,000, and in total amount equal to his account withdrawals. Petitioner's accounts also show that he made large withdrawals at approximately the same *494 time he received Bonds Nos. 2 and 3 from Lorin. The proceeds of these bonds, when petitioner sold them a few months later, totalled slightly more than the withdrawal from petitioner's accounts. Respondent does not dispute petitioner's records. Instead, he contends that the bank statements and checks, by themselves, fail to show that petitioner paid for the bonds. However, respondent offers no explanation for the pattern of deposits to and withdrawals from petitioner's accounts, or for the close relation in time between the credits and the debits, or for the rough equality between the amount of the bond proceeds and the withdrawals which petitioner attributed to payment for those bonds. Respondent merely stresses petitioner's purported lack of credibility, his lack of receipts from Lorin for his cash payments, and his prior indictments. We found petitioner to be forthright and credible. His testimony was detailed and was supported by extensive documentation. Petitioner's assertions that he paid Lorin for the bonds was supported by Lorin's statements to that effect. Although respondent is apparently correct that Lorin did not give petitioner signed receipts for the cash *495 Lorin received, he did give petitioner the bonds. The bonds were bearer bonds, tantamount to cash, and petitioner needed no proof of payment in order to sell or collect them. Thus, petitioner had no need for receipts from Lorin, except to establish clearly a cost basis in the bonds for purposes of respondent's audits. It is possible, as respondent insists, that petitioner originally planned not to report his profit on the sale of the bonds. Petitioner's use of aliases and avoidance of the cash transaction reporting requirements suggest as much. However, regardless of petitioner's initial intentions, he did report the sale of the bonds on his 1980 income tax return. Respondent's speculations on this point do not overcome petitioner's testimony with respect to his basis in the bonds as corroborated by the aforesaid deposits and withdrawals.
By documentation and testimony, petitioner has substantiated a basis of $304,000 in the bonds, and a $4,500 cost of selling Bonds Nos. 2 and 3. The proceeds from the sale of these bonds were $329,503.33. These figures show that petitioner had a $21,003.33 gain from dealing in the bonds. However, petitioner failed to report $3.00 of this *496 gain. His taxable income on these transactions will be increased to reflect this unreported amount. c. Bonds Nos. 4, 5 and 6
In respondent's notice of deficiency, he determined that petitioner had unreported income of $250,212.50 from the sale of Bonds Nos. 4, 5 and 6. On brief, respondent conceded that two-thirds of this amount was properly attributable to Hyman Kaplan. Similarly, on brief, petitioner conceded that he had unreported income of $3,025, which Hyman Kaplan paid to him for use of the PMS account. Thus, the remaining issue is whether one-third of the proceeds from the sale of Bonds Nos. 4, 5 and 6, less $3,025, was income to petitioner in 1980. Petitioner has the burden of proving that the proceeds of the bonds were not income to him. Rule 142(a). After the proceeds of Bonds Nos. 4, 5 and 6 were sold by Goldman Sachs and were credited by PMS to the account of First Miami Securities, petitioner's investment adviser at First Miami Securities used the proceeds to purchase Tri-Borough Bridge and Tunnel Authority bonds. The transit bonds were purchased for the account of Hyman Kaplan and were mailed to him, and received by him, in New York. At trial, Kaplan *497 testified that he had owned two of the MAC Bonds Nos. 4, 5 and 6 which were sold, and that a Mrs. Lubin had owned the other. He also testified that, upon receiving the new transit bonds, he delivered one-third of them to Mrs. Lubin. The face amount of the transit bonds was $240,000, and at the time of purchase they had accrued interest of $7,187. Thus, the total cost of the new bonds equalled the $250,212.50 proceeds from the sale of Bonds Nos. 4, 5 and 6, less Kaplan's $3,025 payment for the use of petitioner's PMS account. Respondent argues that petitioner must show that Mrs. Lubin received one-third of the new bonds in order to establish that petitioner did not have income from one-third of the proceeds from Bonds Nos. 4, 5 and 6. Respondent attempts to draw a negative inference from petitioner's failure to call Mrs. Lubin to the stand to testify. However, whether Mrs. Lubin owned one-third of Bonds Nos. 4, 5 and 6, and received one-third of the new transit bonds, is relevant only to determining Hyman Kaplan's income. This record shows plainly that Hyman Kaplan took delivery of all of the Tri-Borough Bridge and Tunnel Authority bonds. His subsequent disposition of one-third *498 of these bonds is of no consequence to the determination of petitioner's income. In sum, petitioner has adequately explained the crediting of the proceeds to his PMS account, and thence to First Miami Securities, less a $3,025 payment for Kaplan's use of his PMS account. He has also explained the purchase and disposition of the transit bonds with the MAC bond proceeds. Thus, the only unreported income which petitioner received from Bonds Nos. 4, 5 and 6 was the $3,025 payment, which he has conceded on brief. Respondent's determination of additional income on account of the MAC Bonds Nos. 4, 5 and 6 in excess of the $3,025 will not be sustained. 2.Fudpucker's, Inc. Capital Loss Carryover
During 1976 and 1977, petitioner invested a total of $134,942.03 in Fudpucker's. He paid $119,900 for the company's stock, made loans of $9,000 to it, contributed $886.50 in cash to its opening night cash registers, paid $2,953.50 and $1,202.03 due on its mortgages, and put a down payment of $1,000 on its grand piano. Despite the amounts contributed by petitioner, Fudpucker's was unsuccessful. It closed its doors in 1977, and its assets were allocated among its creditors by court decree *499 in 1978.
Petitioner claims that he had a long term capital loss in 1977 from the business failure of Fudpucker's.[7] He maintains that he may carry this loss over into 1978, 1979 and 1980 and offset it against any capital gains he realized during those years. However, he concedes that he did not report his loss in 1977 or the loss carryover during 1978 and 1979. He also concedes that he did not report capital gains of $48,200 in 1978 and $7,152.75 in 1979, because he believed his loss carryovers more than offset the gains. Under section 165(g), a loss from the worthlessness of stock may be deducted only in the year in which it occurs. A loss has not occurred until there is no realistic chance of recovering any part of its value. See United States v. S.S. White Dental Mfg. Co.,274 U.S. 398 (1927). Petitioner's *500 opinion that he would not receive any return on his equity in Fudpucker's after 1977 is not sufficient alone to show that his loss occurred prior to the court's judgment in 1978. Hoover v. Commissioner,32 T.C. 618 (1959). However, two other factors indicate that the stock became worthless in 1977. First, the business closed in 1977. The company could not make money if it failed to admit patrons because it operated a restaurant and lounge. Second, an independent accountant's evaluation of the company showed that in 1977 its liabilities exceeded its assets by approximately $92,000. [8] This deficit, coupled with the absence of any productive activity or appreciating assets, shows that petitioner's stock in Fudpucker's became worthless in 1977. Respondent argues that even if the petitioner had a loss in 1977 from the worthlessness of the stock, he cannot deduct a capital loss carryover on his 1980 return. Citing Gilmore v. Commissioner,T.C. Memo. 1974-41, respondent contends that since petitioner *501 did not claim a capital loss on the stock in 1977, he cannot claim a capital loss carrover in later years. However, Gilmore does not stand for this proposition. Instead, in Gilmore the taxpayer merely failed to establish that he was entitled to a capital loss carryover in the amount claimed. We also note that in Rev. Rul. 76-177, 1976-1 C.B. 224 the respondent required a taxpayer who sustained a long term capital loss in a year without offsetting income, and who failed to claim a deduction for the carryover in a subsequent year, to utilize the loss carryover in the intervening prior years. Petitioner is entitled to the capital loss of $134,942.03 [9] in 1977 on the Fudpucker's stock. To determine the amount available as a carryover to 1980, appropriate adjustments must be made for his other capital gains and losses in 1977, 1978 and 1979.
3. Interest Deductions and Taxes on Petitioner's Residence
a. Taxes
Petitioner paid real estate taxes on his residence in the amount of $1,713.08 for 1980. Respondent disallowed this deduction on grounds that *502 the payment was not made in 1980 or, in the alternative, that title to the house was not in petitioner's name and the liability was not his. We agree with the disallowance. Petitioner testified that he paid these taxes in 1980. However, the receipt from the real estate assessor's office showed that it received the payment on January 12, 1981. Even if the payment had been mailed the last day of 1980, in the normal course of mailing it would have reached the assessor's office in less than twelve days. Petitioner has introduced no evidence tending to show that he actually mailed the payment in 1980, or that the assessor's office delinquently processed his timely posted check. Although petitioner paid only the amount due in December 1980, this does not establish that he made the payment in late December, rather than early January. Under these circumstances, we find that the petitioner has failed to establish that the taxes were paid during 1980. Thus, petitioner is not entitled to deduct them on his 1980 income tax return, whether or not he or his wholly owned corporation is liable for such taxes. b. Interest
During 1980, petitioner deducted interest payments of $2,662.11 *503 on a mortgage encumbering the house in which he lived. Respondent disallowed this deduction on the grounds that petitioner's wholly owned corporation had legal title to the house and that the interest payments were made on an indebtedness owed by the corporation and not by petitioner. Petitioner has the burden of overcoming the presumptive correctness of respondent's determination. Welch v. Helvering,290 U.S. 111 (1933). Petitioner testified that he needed money for construction projects and thus obtained a loan for which the residence was mortgaged. He further testified that he received the proceeds of the loan and subsequently made principal and interest payments on it. However, the documentary evidence fails to indicate whether the loan is the liability of the petitioner or the liability of Federal. To be deductible by the petitioner the interest must be incurred on his indebtedness. See Sheppard v. Commissioner,37 B.T.A. 279 (1938). But in this case as stated before the uncontroverted and unimpeached testimony of the petitioner is to the effect *504 that the house belongs to him and that he owed the debt. The past conduct of both the petitioner and the corporation with third parties including the respondent is consistent with this testimony. We find therefore that the petitioner is the beneficial owner of the property and is primarily responsible for the debt. Cf. Watson v. Commissioner,42 B.T.A. 52, 59-60 (1940), affd. on other issues 124 F.2d 437 (2nd Cir. 1942). [10] We conclude therefore that under the circumstances of this case the petitioner is entitled to the deduction for interest. 4. Interest Payments on Brokerage Accounts
Petitioner had brokerage accounts with Merrill Lynch and Paine Webber. The assets in these accounts were largely tax-exempt municipal bonds. Petitioner borrowed against these bond accounts in 1976 to pay for the stock of Fudpucker's Inc., in 1977 to buy a personal boat costing $77,500 and, in 1980, to acquire the MAC bonds, Onondagas, and other tax-exempt bonds. As a result of his borrowings, petitioner paid interest of $1,331 to Merrill Lynch and $16,239.08 *505 to Paine Webber during the year in issue. Respondent contends that the interest paid on these accounts was "[i]nterest on indebtedness incurred or continued to purchase or carry" tax-exempt obligations within the meaning of section 265(2). Section 265 provides that no deduction is allowed for interest paid on such indebtedness. Thus, respondent concludes that petitioner may not deduct his interest payments to Merrill Lynch and Paine Webber. Petitioner concedes that he may not deduct the interest which he paid on his borrowings to purchase tax-exempt obligations. However, he contends that the total interest he paid in 1980 should be allocated between loans he obtained to buy tax-exempt obligations, and loans he obtained for personal or business purchases. The instant record does not support such an allocation. In fact, petitioner has conceded that it is impossible to allocate precisely the opening 1980 loan balance in his Paine Webber account between borrowings for municipal bonds and for other purposes. However, whether or not such an allocation can be made, petitioner is nonetheless not entitled to deduct any part of the interest paid on his brokerage accounts in 1980. *506 Section 265(2) bars a deduction for interest "if there is 'a sufficiently direct relationship' between the incurrence or continuation of indebtedness and the carrying of tax-exempt securities." Ball v. Commissioner,54 T.C. 1200, 1207 (1970); Wisconsin Cheeseman, Inc. v. United States,388 F.2d 420 (7th Cir. 1968). The taxpayer's purpose in incurring or continuing the indebtedness determines whether a sufficient relation exists. Handy Button Machine Co. v. Commissioner,61 T.C. 846 (1974); Indian Trail Trading Post, Inc. v. Commissioner,60 T.C. 497 (1973), affd. 503 F.2d 102 (6th Cir. 1974). The mere fact that the tax-exempt securities collateralize the indebtedness does not establish the requisite direct relationship between the incurrence or continuance of indebtedness and the carrying of such securities. New Mexico Bancorporation v. Commissioner,74 T.C. 1342 (1980). Cf. Ball v. Commissioner,supra;Wisconsin Cheeseman, Inc. v. United States,supra. *507 In Ball,to determine whether there was a sufficiently direct relationship between the taxpayer's purpose in incurring indebtedness and the carrying of tax-exempt securities, we stated that we would look to whether: (1) the tax exempts were used as collateral; (2) the indebtedness financed a major nonrecurring expenditures (usually over a long term); (3) a reasonable person would sacrifice liquidity and security by selling the bonds, rather than incurring indebtedness to finance the expenditure; and (4) the reasons dominating the taxpayer's use of financing were business reasons. Ball v. Commissioner,supra at 1209. These factors were the same as those considered by the court in Wisconsin Cheeseman, Inc. v. United States,supra.
Applying these factors to the present case, it is apparent that petitioner borrowed against his municipal bond brokerage accounts in order to carry tax-exempt obligations. First, his indebtedness was collateralized by the tax-exempt securities.Second, he used the borrowed proceeds for expenditures in amounts comparable *508 to the amounts in which he regularly purchased bonds. Third, much of his borrowing was for personal, rather than business, reasons. Finally, the record fails to show that a reasonable person would incur debt to buy a boat, or purchase the stock of a small company, rather than selling some of his tax-exempt securities. From these factors, we conclude that there was a direct relationship between petitioner's borrowing and his buying of tax-exempt securities. Respondent's determination on this issue will be sustained. 5. Diversion of Income From Luxury
Respondent determined that petitioner had ordinary income in 1980 in the amount of $56,250 from the diversion of income from Luxury, his wholly owned corporation. Petitioner had reported this amount in 1980 as a long term capital gain from the sale of land. On brief, respondent conceded that petitioner was entitled to report the income as a capital gain. Petitioner contends, on brief, that the income from the sale of the lot was properly reportable in 1978. He argues that the 1978 sale of the lot did not qualify for installment sales treatment. From this he concludes that no gain is reportable in 1980. Petitioner's *509 argument presents a new issue that was not raised in the pleadings, nor tried by consent of the parties. "Time and again this Court has reiterated that we will not consider issues not raised in the pleadings." Rollert Residuary Trust v. Commissioner,80 T.C. 619, 636 (1983). Accordingly, we leave the merits of petitioner's position unexplored. 6. Addition to Tax Under Section 6653(a)[11]
Respondent determined that petitioner was liable for an addition to tax as provided by section 6653(a). This section applies to underpayments of tax which are due to negligence or intentional disregard of rules and regulations. Petitioner contends that he is not liable for the addition because he kept adequate records, did not substantially understate his income, and employed an accountant to prepare his returns. We find that petitioner is liable for the addition under section 6653(a). The petitioner kept good records, and demonstrated a remarkable *510 recall for the particulars of his financial transactions, but unfortunately he did not use the records or his recall to complete his 1980 income tax return properly. For instance, he neglected to report a $3,025 payment he received from Hyman Kaplan, he significantly overstated the size of his capital loss carryover from the worthless stock, and he attempted to deduct more than $17,500 in interest payments which were non-deductible. Furthermore, in the deduction for the loss carryover he intentionally disregarded the regulations by estimating the amount of the original loss and by failing to disclose the adjustments to the loss for his gains or losses during the intervening years. The employment of a certified public accountant to complete his returns does not necessarily insulate him from the addition.See, e.g., Enoch v. Commissioner,57 T.C. 781 (1972); Stone v. Commissioner,22 T.C. 893 (1954). Moreover, there is no evidence that the understatement of tax was due to his reasonable reliance on any honest, but erroneous, advice given by the accountant. Finally, it is irrelevant whether petitioner's underpayment of taxes was substantial. Section *511 6653(a), by its terms, applies if any part of any underpayment is due to negligence or intentional disregard of rules or regulations. To reflect our disposition of the above issues, Decision will be entered under Rule 155.
Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended during the year in issue, unless otherwise provided. ↩
2. Respondent had previously made a jeopardy assessment against petitioner under section 6861 in the amount of approximately $566,000.↩
3. Singer Bank changed its name to Brady National Bank in 1980. For convenience, "Singer Bank" will be used to refer to both banks.↩
4. The record does not disclose the type of problem about which Lorin advised petitioner.↩
5. The parties have not explained in what capacity petitioner served as trustee. We note that Luxury initially had conveyed the lot to petitioner's son, as trustee of a trust for which petitioner was the settlor.↩
6. All rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise provided.↩
7. Apparently he concedes that the amounts paid to Fudpucker's in excess of the $119,900 treasury stock purchase were effectively contributions to capital, rather than loans. Thus, they are deductible under section 165(g)↩, rather than under section 166.
8. Compare Jankowsky v. Commissioner,18 B.T.A. 1039 (1930); Lee v. Commissioner,15 B.T.A. 1213↩ (1929).
9. Although the loss in 1977 was $134,942.03, petitioner claimed $125,000 as a carryover.↩
10. See Gilbert v. Commissioner,↩ a Memorandum Opinion of this Court dated May 12, 1952.
11. Petitioner does not contest the additions to tax determined by respondent under section 6651(a)(1) and section 6654.↩